Cynthia HERDRICH, Plaintiff–Appellant,

v.

Lori PEGRAM, M.D., Carle Clinic Association, and Health Alliance Medical Plans, Incorporated, Defendants–Appellees.

No. 97–1070.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 2, 1997.

Decided Aug. 18, 1998.

James P. Ginzkey (argued), Hayes, Hammer, Miles, Cox & Ginzkey, Bloomington, IL, for Plaintiff–Appellant.

Peter W. Brandt (argued), Livingston, Barger, Brandt & Schroeder, Bloomington, IL, for Defendants–Appellees.

Before WOOD, JR., COFFEY and FLAUM, Circuit Judges.

COFFEY, Circuit Judge.

The defendants-appellees, Carle Clinic Association, P.C. ("Carle"), Health Alliance Medical Plans, Inc. ("HAMP"), and Carle Health Insurance Management Co., Inc., operate a pre-paid health insurance plan which provides medical and hospital services. The plaintiff-appellant, Cynthia Herdrich ("Herdrich"), was covered under a plan subscription through her husband's employer, State Farm Insurance Company, an Illinois corporation.

In March of 1992, Herdrich's appendix ruptured as the result of alleged improper medical treatment while she was in the care of Dr. Lori Pegram ("Pegram"), a physician who practiced under the plan.[1] On October 21, 1992, Herdrich filed a two-count complaint, alleging medical negligence against the health plan operators. Herdrich later added counts III and IV, alleging state law fraud. The defendants, in response, contended that the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq., preempted counts III and IV, and successfully removed the case to federal court. They subsequently filed a motion for summary judgment as to counts III and IV. The trial judge granted the summary judgment motion on count IV only, and gave Herdrich leave to amend count III. In accordance with the court's instructions, Herdrich amended count III to allege that the defendants had breached their fiduciary duty to plan participants, in violation of ERISA. The defendants moved to dismiss the amended count III for failure to state a claim upon which relief could be granted. The court agreed and granted the motion. The remaining two medical negligence counts (I and II) went to trial before a jury. Herdrich prevailed on both of them. Thereafter, she filed a notice of appeal as to the trial court's dismissal of her amended count III. We reverse and remand this case to the district court (on count III) for a trial.

## I. BACKGROUND

This appeal arises out of a complaint filed by Herdrich in the Circuit Court of McLean County, Illinois, on October 21, 1992, against Lori Pegram, M.D. and Carle Clinic Association. Counts I and II of the plaintiff's complaint were based upon a theory of professional medical negligence. Specifically, Herdrich alleged that she suffered a ruptured appendix and, in turn, contracted peri-

---

1. On March 1, 1991, Dr. Pegram examined Herdrich, and acknowledged that she (Herdrich) was experiencing pain in the midline area of her groin. Six days later, March 7, Dr. Pegram discovered a six by eight centimeter inflamed mass in Herdrich's abdomen. In spite of the fact that Herdrich's appendix was noticeably inflamed on March 7, Pegram required her to wait eight more days before undergoing the necessary diagnostic procedure (ultrasound) at a Carle-staffed facility more than fifty miles away in Urbana, Illinois, rather than allowing the procedure to be performed at her local hospital in Bloomington, Illinois. It was during this eight-day waiting period that Herdrich's appendix ruptured, resulting in peritonitis.

tonitis due to Pegram's negligence in failing to provide her with timely and adequate medical care. On February 18, 1994, Herdrich was granted leave to amend the complaint. In her amended complaint, she added two counts (III and IV) of state law fraud against Carle and Health Alliance Medical Plans, Inc.[2] The defendants removed the case to federal court, asserting that the two new counts were preempted by ERISA, and thereafter filed a motion for summary judgment as to counts III and IV only. The court granted summary judgment against Herdrich on count IV "to the extent [she] relies on § 502(a)(3)(B) [of ERISA] as a basis for monetary relief, as opposed to equita-

ble relief," and that provision does not provide for extra-contractual damages. While the trial judge denied the defendants' summary judgment motion as to count III, he did conclude ERISA preempted that count, and granted Herdrich "leave to submit an amended Count III which clearly sets forth her basis for proceeding under ERISA, including the applicable civil enforcement provision." On September 1, 1995, Herdrich filed her amended count III in accordance with the court's instructions. In it, she averred that the defendants breached their fiduciary duty to plan beneficiaries by depriving them of proper medical care and retaining the savings resulting therefrom for themselves.[3]

2. In count III, Herdrich asserted that Carle Clinic violated the Illinois Consumer Fraud Act, 815 ILCS 505/1. *et seq.*, by failing to disclose certain material facts regarding the ownership of HAMP, as well as failing to advise her that the compensation of plan physicians was increased to the extent that they did not order diagnostic tests, utilized facilities owned by those physicians, and did not make emergency or consultation referrals. Count IV alleged that HAMP breached its duty of good faith and fair dealing by increasing its profits and the profits of its contracted physicians through minimizing the use of diagnostic tests, emergency consultation referrals, and facilities not owned by such physicians, all to the detriment of plan beneficiaries.

3. Herdrich's amended count III made the following allegations, among others:

5. In March of 1991 and thereafter, plaintiff's husband was employed by State Farm Mutual Automobile Insurance Company (hereinafter "State Farm").

6. Prior to March of 1991 and annually thereafter, for valuable consideration, through State Farm, defendants sold plaintiff a subscription in CARLE CARE HMO, a pre-paid health insurance plan (hereinafter "the Plan") arranging medical and hospital services for subscribers. . . .

7. State Farm retained no right to direct or control the administration of the Plan.

8. Defendants have the exclusive right to decide all disputed and non-routine claims under the Plan.

9. Under the Plan, defendants exercise discretionary authority and discretionary control of claims management, property and asset management, and administration of the Plan.

10. Defendant [sic] is a participant and beneficiary under the Plan and brings this action on behalf of the Plan pursuant to 29 U.S.C. § 1132(a).

11. Defendants are fiduciaries with respect to the Plan and under 29 U.S.C. § 1109(a) are obligated to discharge their duties with respect

to the Plan solely in the interest of the participants and beneficiaries and

a. for the exclusive purpose of:

i. providing benefits to participants and their beneficiaries; and

ii. defraying reasonable expenses of administering the Plan;

b. with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and like aims.

12. In breach of that duty:

a. CARLE owner/physicians are the officers and directors of HAMP and CHIMCO and receive a year-end distribution, based in large part upon, supplemental medical expense payments made to CARLE by HAMP and CHIMCO;

b. Both HAMP and CHIMCO are directed and controlled by CARLE owner/physicians and seek to fund their supplemental medical expense payments to CARLE:

i. by contracting with CARLE owner/physicians to provide the medical services contemplated in the Plan and then having those contracted owner/physicians:

(1) minimize the use of diagnostic tests;

(2) minimize the use of facilities not owned by CARLE; and

(3) minimize the use of emergency and non-emergency consultation and/or referrals to noncontracted physicians.

ii. by administering disputed and non-routine health insurance claims and determining:

(1) which claims are covered under the Plan and to what extent;

(2) what the applicable standard of care is;

(3) whether a course of treatment is experimental;

(4) whether a course of treatment is reasonable and customary; and

(5) whether a medical condition is an emergency.

The defendants thereafter moved, pursuant to Rule 12 of the Federal Rules of Civil Procedure, to dismiss Herdrich's amended count III for failure to state a claim upon which relief could be granted.

By agreement, the case—including the defendants' motion to dismiss—was assigned to a magistrate judge, who recommended that the amended count III be dismissed because, in his opinion, "[t]he plaintiff fail[ed] to identify how any of the defendants is involved as a fiduciary to the Plan." He did, however, recommend that the court afford Herdrich "one last opportunity" to re-plead her claim under ERISA. Herdrich promptly filed a Rule 72 objection to the magistrate's recommendation. Less than two weeks later, on April 15, 1996, the district court denied that objection and adopted the magistrate's recommendation as to count III. In so doing, it gave Herdrich 21 days from the entry of the order to re-plead her claim. Herdrich chose not to re-plead and stood on count III as amended.

The remaining counts, I and II, went to trial in early December 1996, and the jury returned a verdict in Herdrich's favor on both counts, awarding her $35,000 in compensatory damages. She then appealed the district court's earlier dismissal of her amended count III.

## II. ISSUES

On appeal, Herdrich contends that the district court erred in dismissing the amended count III of her complaint for failing to sufficiently state a claim for breach of a fiduciary duty under ERISA. The defendants contend that we lack jurisdiction to hear this case due to Herdrich's failure to file a timely notice of appeal from the order of dismissal, entered

April 15, 1996. The defendants further argue that Herdrich's request for damages is inappropriate insofar as beneficiaries under an ERISA benefits plan may not recover "anything other than the benefits provided expressly in the plan."

## III. DISCUSSION

### A. *Jurisdiction*

As an initial matter, we are called upon to determine whether or not we have jurisdiction to hear this appeal. The defendants contend that Herdrich's failure to file a notice of appeal within thirty days from the district court's April 15, 1996, order of dismissal leaves us without jurisdiction. *See* Fed. R.App. P. 4(a)(1) ("[I]n a civil case in which an appeal is permitted by law as of right from a district court to a court of appeals the notice of appeal ... must be filed with the clerk of the district court within 30 days after the date of entry of the judgment or order appealed from."). Alternatively, the defendants urge that jurisdiction is improper because the April 15 order was not a "final decision" for purposes of appealability, as required by 28 U.S.C. § 1291. We disagree and think it clear that Carle and HAMP have misconstrued the law in relation to both of their arguments.

 This court has jurisdiction to hear appeals from the "final decisions" of the federal district courts. 28 U.S.C. § 1291. A "final" decision is defined as one that terminates the litigation. *See Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945). 28 U.S.C. § 1292 also gives us jurisdiction over appeals from specified interlocutory orders.[4] Generally speak-

---

13. As a direct and proximate result of defendants' breach of their fiduciary duties, the Plan has been deprived of those sums comprising the supplemental medical expenses made by HAMP and CHIMCO to CARLE, as well as those amounts which would have been realized by prudently investing those supplemental medical expenses.

4. 28 U.S.C. § 1292 provides, in relevant part:
(a) ... the courts of appeals shall have jurisdiction of appeals from:
 (1) Interlocutory orders of the district courts of the United States ..., or of the judges

thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;
(2) Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;
(3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admi-

ing, interlocutory appeals are disfavored, and appellate courts are reluctant to exercise their discretion to grant such requests, as they all too frequently cause unnecessary delays in lower court proceedings and waste the resources of an already overburdened judicial system. *See Coopers & Lybrand v. Livesay*, 437 U.S. 463, 473–74, 98 S.Ct. 2454, 2460–61, 57 L.Ed.2d 351 (1978). For these reasons, the preferred practice is to defer appellate review until the entry of a final judgment in order that we might rule on *all* issues at one time. *See* 437 U.S. at 475, 98 S.Ct. at 2461. "[E]ven if the district judge certifies the order under § 1292(b), the appellant still has the burden of persuading the court of appeals that exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Id.* (citation and internal quotation omitted).

■■■ A trial court's order dismissing a complaint is not a final judgment for purposes of appeal under 28 U.S.C. § 1291 because it does not terminate the litigation. *See Paganis v. Blonstein*, 3 F.3d 1067, 1070 (7th Cir.1993) ("The dismissal of a complaint does not end the litigation. . . . In contrast, a dismissal of the entire action ends the litigation and forces the plaintiff to choose between appealing the judgment or moving to reopen the judgment and amend the complaint pursuant to Fed.R.Civ.P. 59 or Rule 60. . . . Therefore, if a judgment entry dismisses only the complaint, it is not a final judgment.") (internal citations and quotations omitted). This is particularly true when one or more counts of a multiple count complaint and/or indictment are dismissed for whatever reason, and others are left intact. In such cases, an interlocutory appeal of the dismissal order is available only after the order is certified by the district court under section 1292(b), *supra*, or by entry of a partial final judgement under Rule 54 of the Federal Rules of Civil Procedure. *See Principal Mut. Life Ins. Co. v. Cincinnati TV 64 Ltd.*

*Partnership*, 845 F.2d 674, 676 (7th Cir.1988) (district court order granting judgment on one count but dismissing nine other counts without prejudice and expressly providing plaintiff right to reinstate seven counts was not final appealable order because it did not "terminate the litigation"). Just because the district court failed to take either of these two courses of action in the instant case does not mean we are without jurisdiction over this appeal, for the court's April 15 order of dismissal became final, and thus appealable, upon entry of final judgment on December 15, 1996.

■ Contrary to the jurisdictional claims made in the defendants' brief, an order which is not a final judgment when entered becomes final or appealable upon the entry of a final judgment. The appeal of this judgment renews all issues previously pleaded and resolved by the trial court in litigation. *See In the Matter of Grabill Corp.*, 983 F.2d 773, 775 (7th Cir.1993). In the case under consideration, the April 15, 1996, order dismissing Herdrich's amended count III was an interlocutory ruling, rather than a final decision, as it failed to dispose of all the issues before the court. That is, the plaintiff's counts I and II were not dismissed, and the litigation between Herdrich and the defendants was continuing. The trial court's order dismissing the plaintiff's amended count III did not become final until such time as the judgment was entered on December 5, 1996. Herdrich's appeal from the trial court's dismissal of count III of her complaint, filed on January 6, 1997, was timely in that she filed it within thirty days of the December 5 entry of judgment.

### B. The Plaintiff Properly Stated a Claim Under ERISA

The defendants next contend that Herdrich has failed to state a cause of action for breach of a fiduciary duty under ERISA. As previously mentioned, the district court dis-

---

ralty cases in which appeals from final decrees are allowed.

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of

law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing such order.

missed Herdrich's amended count III, finding that even as amended, the complaint did not state a claim upon which relief might be granted.

 This court reviews dismissals of complaints *de novo. See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). "In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* A complaint must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory. *See Sutliff, Inc. v. Donovan Cos., Inc.,* 727 F.2d 648, 654 (7th Cir.1984). But such allegations need only state a *possible* claim, not a winning claim. *See, e.g., Conley,* 355 U.S. at 45–46, 78 S.Ct. at 102; *Trevino v. Union Pac. R.R. Co.,* 916 F.2d 1230, 1234 (7th Cir. 1990) ("The federal rules do not require a plaintiff to allege sufficient facts to establish his right to a judgment. All it requires [sic] ... is a 'short and plain' ... statement of what his claim is.") (quoting Fed.R.Civ.P. 8(a)(2)). And this court has steadfastly held that a plaintiff's complaint "need not plead facts or legal theories; it is enough to set out a claim for relief...." *Nance v. Vieregge,* 147 F.3d 589, 590–91 (7th Cir.1998). Moreover, "[a] complaint may not be dismissed under Fed.R.Civ.P. 12(b)(6) just because it omits factual allegations...." *La Porte County Republican Cent. Comm. v. Board of Comm'rs of the County of La Porte,* 43 F.3d 1126, 1129 (7th Cir.1994).

 ERISA is a statutory scheme which regulates all "private employee benefits plans, including both pension plans and welfare plans." *District of Columbia v. Greater Washington Bd. Of Trade,* 506 U.S. 125, 127, 113 S.Ct. 580, 582, 121 L.Ed.2d 513 (1992).

The definition of a "welfare plan" includes "any plan, fund, or program" maintained for the purpose of providing medical or other health benefits for employees or their beneficiaries "through the purchase of insurance or otherwise." *Id.* (quoting 29 U.S.C. § 1002(1)). Importantly, ERISA establishes uniform standards, including rules relating to "reporting, disclosure, and fiduciary responsibility." *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 137, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990) (citation omitted).

 In order to properly state a claim for breach of fiduciary duty under ERISA, the plaintiff's complaint must allege facts which set forth: (1) that the defendants are plan fiduciaries; (2) that the defendants breached their fiduciary duties; and (3) that a cognizable loss resulted. *See* 29 U.S.C. § 1104(a). We are of the opinion that Herdrich's pleadings have more than sufficiently alleged each of these three elements.

### 1. Fiduciary Status

As previously explained, the district court adopted the magistrate judge's recommendation that Herdrich's amended count III be dismissed for failure to allege that the defendants were fiduciaries because "none of the defendants is even mentioned in the Subscription Agreement attached to the complaint" and "the plaintiff fails to identify how any of the defendants is involved as a fiduciary to the Plan."[5] We disagree with this determination.

 ERISA defines the term "fiduciary" in 29 U.S.C. § 1002(21)(A), which reads, in relevant part:

> Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority of control respecting management or disposition of its assets ... or (iii) he has any

---

5. During the pleading stage of this suit, the defendants and plaintiff took dramatically different positions from what they now argue on appeal concerning the issue of whether the defendants were plan fiduciaries. That is, Herdrich originally maintained that the defendants were not plan fiduciaries, while the defendants insisted that they were. In the parties' respective appellate briefs, however, the defendants contend that they are not fiduciaries of the Plan, whereas the plaintiff claims they are.

discretionary authority or discretionary responsibility in the administration of such plan.

Congress, when it enacted ERISA, intended that this statutory definition of "fiduciary" be broadly interpreted. As stated by the Chairman of the House Committee on Education and Labor, 120 Cong. Rec. 3977, 3983 (February 25, 1974) *reprinted*, 2 Legislative History of the Employee Retirement Income Security Act of 1974 at 3293:

> The Committee has adopted the view that the definition of fiduciary is of necessity broad.... A fiduciary need not be a person with direct access to the assets of the plan.... Conduct alone may in an appropriate circumstance impose fiduciary obligations. It is the clear intention of the Committee that any person with a specific duty imposed upon him by this statute be deemed to be a fiduciary....

Consistent with the expressed intent of Congress, this court has routinely construed the ERISA term, "fiduciary," broadly. *See Chicago Bd. Options Exch., Inc. v. Connecticut Gen. Life Ins. Co.*, 713 F.2d 254, 260 (7th Cir.1983) ("It is clear that Congress intended the definition of fiduciary under ERISA to be broad...."). In so doing, we have emphasized the importance of discretionary control and authority in determining who is a plan fiduciary. *See Harris Trust and Sav. Bank v. Provident Life and Accident Ins. Co.*, 57 F.3d 608, 613 (7th Cir.1995). In *Harris Trust*, for example, an employee's daughter lost her health insurance coverage when her father's company, Specialty Brands, Inc., was acquired by Campbell Soup. *See id.* at 611–12. The employee's new health plan was funded by Campbell and merely administered by Provident Life Insurance. *See id.* In concluding that Campbell was the plan fiduciary, we emphasized that it was Campbell, not Provident, who retained the right to direct and control the claims procedures and practices, as well as the right to decide all disputed and non-routine claims:

> The undisputed evidence shows that the Campbell Plan was created and fully funded by Campbell. *Provident was simply hired to administer the claims process under Campbell's direction and control* in accordance with an Administrative Services Agreement. Pursuant to that agreement, *Campbell, not Provident, dictates the claims administration procedures and practices which are to be followed, and all benefits eligibility determinations must be made in accordance with those procedures and practices. Campbell also retains the right under the agreement to decide all disputed and non-routine claims.*

*Id.* at 613 (emphasis added). Thus, it was the *retention of control of the claims process* that brought about Campbell's fiduciary status.

In the case *sub judice*, the magistrate, in his report and recommendation, opined that "the plaintiff fails to identify how any of the defendants is involved as a fiduciary to the plan," and that the plaintiff's amended third count "merely repeats the statutory language of § 1109(a) with regard to fiduciaries." We do not agree that Herdrich's amended count III is as "bare-bones" as the magistrate characterizes it. Although the amended third count *does* repeat some of the statutory language of ERISA, it also alleges, as in *Harris Trust*, that the "*defendants have the exclusive right to decide all disputed and non-routine claims under the plan.*" The defendant-physicians managed the Plan, including the doctor referral process, the nature and duration of patient treatment, and the extent to which participants were required to use Carle-owned facilities. In fact, the board of directors consisted exclusively of the Plan physicians who were thus in control of each and every aspect of the HMO's governance, including their own year-end bonuses. And, like in *Harris Trust*, Herdrich pleaded that the defendants had the exclusive right to decide all disputed and non-routine claims. In our view, this level of control satisfies ERISA's requirement that a fiduciary maintain "discretionary control and authority." We can reasonably infer that Carle and HAMP were plan fiduciaries due to their discretionary authority in deciding disputed claims.

In a last ditch effort, the defendants parrot the magistrate's observation that "none of the defendants is even mentioned in the Subscription Agreement attached to the

complaint," and contend that they are not fiduciaries of the Plan because they are not specifically named in the Plan instrument, pursuant to § 1102(a)(2) of ERISA.[6] But the fact of the matter is that HAMP *is* prominently identified in the first sentence on the first page of the Plan's Group Subscription Certificate. *See* Group Subscription Certificate ("Carle Care HMO, a product of Health Alliance Medical Plans, Inc., is organized as a health maintenance organization to do business as a prepaid health plan in Illinois and Indiana."). Moreover, a party's fiduciary status hinges not on whether it is named in the plan agreement, but rather on whether it satisfies the statutory definition of a fiduciary in section 1002(21)(A) of ERISA, quoted *supra p.* 369–70. Contrary to the defendants' assertion, and the magistrate's conclusion, Carle and HAMP are, in fact, fiduciaries.

### 2. *Breach of Fiduciary Duty*

Having determined that the defendants are fiduciaries under ERISA, we next consider whether the direct and inferential allegations contained in Herdrich's complaint are sufficient to establish the requisite breach of a fiduciary duty. An ERISA fiduciary must perform his duties in accordance with the standards set forth in 29 U.S.C. § 1104(a)(1), which provides:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . .

*A fiduciary breaches its duty of care under section 1104(a)(1)(A) whenever it acts to benefit its own interests.* See James F. Forden et al., *Handbook on ERISA Litigation* § 3.03[A], at 3–53 (1994) (collecting cases). For example, ERISA expressly prohibits fiduciaries from "deal[ing] with the assets of the plan in his own interest or for his own account," or "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b). The requirement that an ERISA fiduciary act "with an eye single to the interests of the participants and beneficiaries," *Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d Cir.1982), is the most fundamental of his or her duties, and "must be enforced with uncompromising rigidity." *NLRB v. Amax Coal Co.,* 453 U.S. 322, 329–30, 101 S.Ct. 2789, 2794–96, 69 L.Ed.2d 672 (1981) (citation and internal quotation omitted). This duty, the violation of which subjects a fiduciary to liability under 29 U.S.C. § 1109,[7] is directed particularly at schemes "tainted by a conflict of interest and thus highly susceptible to self dealing," *Lowen v. Tower Asset Management, Inc.,* 829 F.2d 1209, 1213 (2d Cir.1987), like the one at issue here.

We think a number of authorities are particularly instructive in assisting us to determine whether the allegations in Herdrich's complaint, and the logical inferences drawn therefrom, are sufficient to demonstrate that there was a breach of the defendants' fiduciary duty. In *Dasler v. E.F. Hutton & Co., Inc.,* 694 F.Supp. 624 (D.Minn.1988), for example, the defendant brokerage firm acted as fiduciary for a profit-sharing plan. In his complaint, the plaintiff-beneficiary of the plan alleged that the defendant breached its ERISA-based fiduciary duty by engaging in

---

**6.** Section 1102(a)(2) defines a "named fiduciary" as a party who is named in the plan.

**7.** Section 1109(a) of ERISA provides:
Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

excessive securities trading on behalf of the plan. *See id.* at 632. The court agreed, finding "that defendants considered their own interests and commission income when making investment decisions for the plan." *Id.* Similarly, in *Anweiler v. American Elec. Power Serv. Corp.*, 3 F.3d 986, 991–92 (7th Cir.1993), this court held that the defendant fiduciary breached its duty of loyalty and care under ERISA when it misled its pension plan participants by failing to give them complete material information concerning the terms of reimbursement under the pension plan. And in *Shea v. Esensten*, 107 F.3d 625 (8th Cir.1997), the Eight Circuit concluded that the defendants therein, much like Carle and HAMP, breached their fiduciary duty by *failing to disclose to plan participants a secret incentive structure that provided financial rewards to primary care physicians who minimized their use of tests and referrals. See id.* at 628–29.

The Northern District of Illinois, in *Ries v. Humana Health Plan, Inc.*, 1995 WL 669583 (N.D.Ill., 1995), faced facts similar to those at bar. In *Ries*, the defendant, Humana Health, obligated the participants in its health plan to fully reimburse the plan for the costs associated with his or her treatment if such costs were recovered, by way of settlement or judgment, from the party (other than the plan) who caused his or her injury or disease. *See id.* at *1. The plan generally provided coverage for 80 percent of costs, while plan participants were obligated to finance 20 percent. Although Humana routinely collected a full 80 percent reimbursement from participants, Humana was in fact not paying 80 percent of the covered medical expenses, because it covertly arranged to receive a substantial discount for its share of the charges, unbeknownst to the plan participants. *See id.* at *3. As a result, plan participants were paying more than 20 percent of the amounts received by the hospitals, and Humana was, in effect, recouping an additional bonus for itself by paying less than the 80 percent of the medical expenses, as set forth in the plan. The *Ries* court ruled that ERISA did not "*permit a plan insurer to recoup more from its insureds than it actually pays out on their behalf under the terms of undisclosed discounting arrangements with health care providers.*" *Id.* at *2 (emphasis added). The court went on to note that the "fiduciary's covert profiteering at the expense of insureds is inconsistent with its duties of acting 'solely in the interest of the participants and beneficiaries.'" *Id.* at *7 (quoting 29 U.S.C. § 1104(a)(1)(A)).

Drawing parallels to the case under consideration, Herdrich sets forth, in the amended third count of her complaint, the intricacies of the defendants' incentive structure. *The Plan dictated that the very same HMO administrators vested with the authority to determine whether health care claims would be paid, and the type, nature, and duration of care to be given, were those physicians who became eligible to receive year-end bonuses as a result of cost-savings. Because the physician/administrators' year-end bonuses were based on the difference between total plan costs (i.e., the costs of providing medical services) and revenues (i.e., payments by plan beneficiaries), an incentive existed for them to limit treatment and, in turn, HMO costs so as to ensure larger bonuses.* With a jaundiced eye focused firmly on year-end bonuses, it is not unrealistic to assume that the doctors rendering care under the Plan were swayed to be most frugal when exercising their discretionary authority to the detriment of their membership.

For the purposes of a motion to dismiss, we are obligated to view complaints in the light most favorable to the non-moving party and assume all factual allegations to be true. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Herdrich's amended count III alleged "a claim for relief" that the incentive scheme, which invited and encouraged plan fiduciaries to place their own interests ahead of the interests of plan beneficiaries, constituted a breach of the administrators' fiduciary duty, and that "[a]s a direct and proximate result of defendants' breach of their fiduciary duties, the Plan has been deprived of those sums comprising the supplemental medical expenses...." If we accept her allegations of a breach and claim of damages as true, as we are required to do, she has established

sufficient grounds to defeat the motion to dismiss.

■ The dissent disagrees with this aspect of today's holding, which it characterizes as concluding that "the mere existence of this asserted conflict [i.e., the conflict between the incentive scheme for Carle doctors to limit medical care and treatment, on the one hand, and the fiduciary duty of Carle to the beneficiaries, on the other], without more, gives rise to a cause of action for breach of fiduciary duty under ERISA." That is not the conclusion we reach. Our decision does not stand for the proposition that the existence of incentives *automatically* gives rise to a breach of fiduciary duty. Rather, we hold that incentives *can* rise to the level of a breach where, as pleaded here, the fiduciary trust between plan participants and plan fiduciaries no longer exists (i.e., where physicians delay providing necessary treatment to, or withhold administering proper care to, plan beneficiaries for the sole purpose of increasing their bonuses).

The dissent admittedly does "not rule out the possibility that the imposition of incentives to limit care could support a claim of breach of fiduciary duty." In its view, such a claim might very well be viable when "there is a serious flaw in the manner in which the incentive arrangement is established. . . ." Having said this, we fail to see how it can conclude that Herdrich did not plead such a flaw in the structure of the incentive program at issue. Her amended count III included the following allegation:

a. CARLE owner/physicians are the officers and directors of HAMP and CHIMCO and receive a year-end distribution, based in large part upon, supplemental medical expense payments made to CARLE by HAMP and CHIMCO;

b. Both HAMP and CHIMCO are directed and controlled by CARLE owner/physicians and seek to fund their supplemental medical expense payments to CARLE:

i. *by contracting with CARLE owner/physicians to provide the medical services contemplated in the Plan and then having those contracted owner/physicians:*

(1) *minimize the use of diagnostic tests;*

(2) *minimize the use of facilities not owned by CARLE; and*

(3) *minimize the use of emergency and non-emergency consultation and/or referrals to non-contracted physicians.*

ii. *by administering disputed and non-routine health insurance claims and determining:*

(1) *which claims are covered under the Plan and to what extent;*

(2) *what the applicable standard of care is;*

(3) *whether a course of treatment is experimental;*

(4) *whether a course of treatment is reasonable and customary; and*

(5) *whether a medical condition is an emergency.*

Thus, Herdrich alleges a "serious flaw" that springs from the authority of physician/owners of Carle *to simultaneously control the care of their patients and reap the profits generated by the HMO through the limited use of tests and referrals.* Under the terms of ERISA, Herdrich most certainly has raised the specter that the self-dealing physician/owners in this appeal were not acting "solely in the interest of the participants" of the Plan.

■ The dissent also stresses that ERISA allows fiduciaries to adopt dual loyalties, and that maintaining dual loyalties does not in itself constitute a breach of fiduciary duty. We do not disagree with this contention, for it is well established that dual loyalties are tolerated under ERISA. *See, e.g., Donovan v. Bierwirth,* 538 F.Supp. 463, 468 (E.D.N.Y.1981). Our point is not that a fiduciary may not have dual loyalties; it is that the tolerance of dual loyalties does not extend to the situation like the case before us where a fiduciary jettisons his responsibility to the physical well-being of beneficiaries in favor of "loyalty" to his own financial interests. Tolerance, in other words, has its limits.

In *Donovan*, the defendant, an executive of the Grumman Corporation, served as a trustee of the corporation's pension fund, and invested the fund's finances in Grumman stock. *See id.* at 465. The court ruled that although the defendant had dual loyalties when he acted as an officer of the fund-sponsoring corporation, his primary loyalty to the fund was the only loyalty that could affect his judgment. *See id.* at 468. The court found that ERISA authorizes "a trustee to invest in sponsor corporation stock in spite of dual loyalties and conflicting interests so long as (1) he acts exclusively for the benefit of the plan beneficiaries and participants and otherwise complies with ERISA section [1104], and (2) his actions are not violative of the proscriptions of ERISA section [1106]." [8] *Id.* at 469. A trustee with such dual loyalties has an obligation to act fairly and equitably on behalf of those concerned with the result of the action taken. *See Donovan*, 538 F.Supp. at 469 (citation omitted).

The dissent, presumably, would not agree with *Donovan's* effort to mark the border between an acceptable dual loyalty and the impermissible breach of fiduciary duty. From our reading, the dissent would not mark a border at all. It seems to argue that dual loyalties, and incentive schemes generally, are *per se* valid almost without limitation, and that only when there is a "breakdown in the market," or some "serious flaw" in the manner in which the incentive arrangement in question is established, can there possibly be a breach of fiduciary duty. Specifically, the dissent notes, without citation to any authority, that "plan sponsors are likely to take their business elsewhere if they perceive that incentives are working to the detriment of beneficiaries or the plan itself, and thus market forces go a long way towards ensuring that incentives do not rise to dangerous or undesirable levels."

To our way of thinking, the dissent's market theory flies in the face of the facts as set forth in the very record before us. On March 7, 1991, Pegram, Herdrich's doctor, discovered a six by eight centimeter "mass" (later determined to be her appendix) in Herdrich's abdomen. Although the mass was inflamed on March 7, Pegram delayed instituting an immediate treatment of Herdrich, and forced her to wait more than one week (eight days) to obtain the accepted diagnostic procedure (ultrasound) used to determine the nature, size and exact location of the mass. Ideally, Herdrich should have had the ultrasound administered with all speed after the inflamed mass was discovered in her abdomen in order that her condition could be diagnosed and treated before deteriorating as it did,[9] but Carle's policy requires plan participants to receive medical care from Carle-staffed facilities in what they classify as "non-emergency" situations. Because Herdrich's treatment was considered to be "non-emergency," she was forced to wait the eight days before undergoing the ultrasound at a Carle facility in Urbana, Illinois. During this unnecessary waiting period, Herdrich's health problems were exacerbated and the situation rapidly turned into an "emergency"—her appendix ruptured, resulting in the onset of peritonitis. In an effort to defray the increased costs associated with the surgery required to drain and cleanse Herdrich's ruptured appendix, Carle insisted that she have the procedure performed at its own Urbana facility, necessitating that Herdrich travel more than fifty miles from her neighborhood hospital in Bloomington, Illinois. The "market forces" the dissent refers to hardly seem to have produced a positive result in this case— Herdrich suffered a life-threatening illness (peritonitis), which necessitated a longer hospital stay and more serious surgery at a greater cost to her and the Plan. And, as discussed below, we are far from alone in our belief that market forces are insufficient to

---

8. Section 1104(a)(1) of ERISA provides that a "fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries."

9. Doctor Hyman Lans, Herdrich's medical expert, stated at his deposition that Herdrich's condition worsened during the eight-day waiting period "[b]ecause obviously there has been another week of that appendix becoming necrotic and sitting in the pus, and obviously the process has continued during that week and doesn't correct itself."

cure the deleterious affects of managed care on the health care industry.

Across the country, health care critics and consumers are complaining that the quality of medical treatment in this nation is rapidly declining, leaving "a fear that the goal of managing care has been replaced by the goal of managing costs." Jan Greene, *Has Managed Care Lost Its Soul? Health Maintenance Organizations Focus More on Finances, Less on Care*, Am. Hosp. Publishing Inc., May 20, 1997.

An increasing number of Americans believe that dollars are more important than people in the evolving [HMO] system. Whether justified or not, this assumption needs to be taken seriously, according to keepers of the industry's conscience. University of Pennsylvania bioethicist Arthur Caplan argues that managed care should take a lesson from professional sports, which has alienated some fans because money and profits have eclipsed the reasons why fans care about the games: hero worship and the virtues of teamwork, loyalty and trustworthiness. The same goes for doctors. "People go to their doctor not because he's a good businessman … but because he's a good advocate, someone we can admire," says Caplan. "If we have to struggle with him to get what we want, we will have no trust anymore."

To regain trust, HMOs need to be more sensitive to the doctor-patient relationship and remove the physician from direct financial interest in patient care, says Caplan. Instead, doctors should have a predetermined budget and be able to advocate for patients without direct personal gain or loss.

Another hot-button issue for HMO members is the fear that a lifesaving experimental procedure will be denied because of its cost. Caplan says the industry should follow the lead of the handful of HMOs that have established outside, independent panels to make final decisions.

*Id.* Even care providers fear that they "have become somewhat preoccupied with [their] ownership status and consequently have not paid as much attention as [they] should have to improving [their] basic core competen-

cies." *Id.* The specter of money concerns driving the health care system, says a group of Massachusetts physicians and nurses, "threaten[s] to transform healing from a covenant into a business contract. Canons of commerce are displacing dictates of healing, trampling our professions' most sacred values. Market medicine treats patients as profit centers." *For Our Patients, Not for Profits: A Call to Action*, JAMA, Dec. 3, 1997, at 1773. As one professional stated, "It's too bad. We used to spend most of our time worrying about how to do a better job. Now we worry about doing a better job at a lower price." *Id.*

Thousands of American physicians and nurses, outraged by the increasingly "corporate" nature of American medicine, recently staged a reenactment of the Boston Tea Party by symbolically dumping $1 million each minute into Boston Harbor to dramatize the amount of health care money that is being wasted to pay for HMO marketing, profits, and administrative salaries. *See id.*

The shift to profit-driven care is at a gallop. For nurses and physicians, the space for good work in a bad system rapidly narrows. For the public, who are mostly healthy and use little care, awareness of the degradation of medicine builds slowly; it is mainly those who are expensively ill who encounter the dark side of market-driven health care. We criticize market medicine not to obscure or excuse the failings of the past, but to warn that the changes afoot push nursing and medicine farther from caring, fairness, and efficiency.

*Id.* Another commentator observed that "American 'market theology' is being invoked as an excuse for the downgrading of patient care and the growing absence of compassion in health care." Bob LeBow, *Nation Needs to Take Control of Health Care System for Patients, not Profits*, Idaho Statesman, Dec. 2, 1997, at 6A. Instead of providing health care, doctors are forced to "spend many hours persuading health insurance companies that we are not trying to manipulate them into paying more money than Medicare does for kidney transplants." Gabriel M. Danovitch, et al., *And How the Decisions Are*

*Made*, 331 New Eng. J. Med., at 331–32 (1984).

In order to minimize health care costs and fatten corporate profits for HMOs, primary care physicians face severe restrictions on referrals and diagnostic tests, and at the same time, must contend with ever-shrinking incomes.

> Sixty percent of all managed-care plans, including HMOs and preferred-provider organizations, now pay their primary-care doctors through some sort of "capitation" system, according to the Physician Payment Review Commission in Washington, D.C. That is, rather than simply pay any bill presented to them by your doctor, most HMOs pay their physicians a set amount every month—a fee for including you among their patients. At Chicago's GIA Primary Care Network, for instance, physicians get $8.43 each month for every male patient ... and $10.09 for every female patient.... Some HMOs, such as Oxford Health Plans, Cigna and Aetna, have "withhold" systems, in which a percentage of the doctors' monthly fees are withheld and then reimbursed if they keep their referral rates low enough. Others, like U.S. Healthcare, pay bonuses for low referral rates.

John Protos, *Ten Things Your HMO Won't Tell You*, Inside, June 30, 1997, at 44.

> [T]here is ample evidence that the bottom-line mentality is taking over. HMOs refer to the proportion of premiums they pay out for patient care as their "medical-loss ratio"—a chilling choice of words. The Association of American Medical Colleges reported last November that medical-loss ratios of for-profit HMOs paying a flat fee to doctors for treatment averaged only 70% of their premium revenue. The remaining 30% went for administrative expenses—and profit.

George J. Church, *Backlash Against HMOs*, Time, Apr. 14, 1997, at 32. Doctors, in accordance with bureaucracy-like HMO and government (i.e., Medicare) reporting regulations, are often required to engage in countless hours of paper shuffling and file stacks of forms to complete even the most basic reimbursement claims. Moreover, the re-cent trend of sky-rocketing malpractice insurance rates has put additional stress on physicians and surgeons: certain specialists may spend 60 percent of their overhead costs on malpractice insurance, some obstetrician-gynecologists pay $100,000 per year for coverage, and neurosurgeons or orthopaedic surgeons can pay in excess of $100,000 per year. *See* Charles Krauthammer, *Driving the Best Doctors Away; Physicians are Getting Hammered by Managed Care Micromanagement and Malpractice Insurance Premiums*, Wash. Post, Jan. 9, 1998, at A21. In fact, many observers note that an increasing number of physicians are abandoning the profession because they are disenchanted with the notion of having "medically ignorant administrators" dictate that they limit patient care so as to pad the pockets of the officers of insurance companies and HMO organizations. *See id.* "More than money, this is what is driving these senior doctors crazy: some 24–year–old HMO functionary who knows as much about medicine as he does about cartography demanding to know why Mr. Jones, the diabetic in renal failure, has not been discharged from the hospital yet." *Id.* Nor is the market serving the future of the practice of medicine well—the pool of applicants at our nation's medical schools seems to be drying up; many potential doctors cite increased costs and unpleasant, HMO-controlled working conditions as key factors driving the nation's aspiring surgeons away from the operating table. *See* Judith Graham, *Medical School Applicants Dip*, Chi. Trib., Feb. 1, 1998, at 1. Yet another consequence of the increase in HMO decision-making authority has been a dramatic rise in consumer disputes with HMOs. Last year, consumers in the State of Wisconsin filed nearly 5,000 grievances against Wisconsin HMOs, almost a third more than in 1986. Of these 5,000 grievances, HMOs reversed their care decisions in 68 percent of complaints. *News From Every State*, USA Today, June 4, 1998, at 10A.

Many physicians, frustrated with the cost pressures of managed care, including those attributable to unnecessary HMO, insurance company, and governmental regulations, have attempted to counter the influence of

large, regional health care providers by organizing into unions. *See Doctors Seeking to Unionize: A Remedy?*, Chi. Trib., Feb. 1, 1998, at 10. Collective bargaining provides unionized doctors with the ability to wield greater leverage when faced with an HMO's efforts to reduce physicians' incomes. *See id.* Doctors who are dissatisfied with the corporate, profit-driven nature of HMOs, as well as the loss of independence in the doctor-patient relationship, are also considering competing head-on and are forming their own HMOs, just as was done here. Many of these physicians and surgeons have joined their respective specialty practices and linked up with local hospitals to compete with regional HMOs for managed care contracts. But in these circumstances, as in our case, doctors often assume the dual role of careprovider and HMO administrator, and are ultimately held accountable for breaches of fiduciary duty.

This court has previously addressed the cost-saving pressures currently being exerted on medical-care providers. In *State of Wis., Dep't of Health and Soc. Servs. v. Bowen*, 797 F.2d 391 (7th Cir.1986), the author of this majority opinion addressed the Secretary of Health's control over Medicaid's patient care costs.

> A nursing practitioner or physician's assistant is not adequately trained to make the all-important decision dealing with levels of care. It is shocking in our day of advanced medical research, techniques and surgery, when organ transplants and space medicine research are routinely-accepted medical procedures, that we seem to be forgetting and casting aside the all-important human and personal element in medical care. It is equally shocking that we are in effect turning the medical transfer decisions over to the paper shuffling bureaucrat for a review of an inadequately trained medical support assistant. Nursing practitioners and physician's assistants are incapable of making this life-threatening judgment, because they lack both the personal contact with the patient and his family over a period of time, and most frequently lack the necessary expertise, training and experience in psychology, psychiatry and geriatrics required to properly interpret and knowledgeably assess the dangers of transfer trauma.

*Id.* at 410 (Coffey, J., dissenting).[10]

We must remember that doctors, not insurance executives, are qualified experts in determining what is the best course of treatment and therapy for their patients. Trained physicians, and them alone, should be allowed to make care-related decisions (with, of course, input from the patient). Medical care should not be subject to the whim of the new layer of insurance bureaucracy now dictating the most basic, as well as the important, medical policies and procedures from the boardroom. If it is, "the cost cutting of managed health organizations and insurers may undermine what is, for now, the best medical care in the world." Joan Beck, *"Drive-by Deliveries" Risky Health Game*, Hous. Chron., Oct. 28, 1995, at 36. It shall also place physicians in a more severe conundrum, forcing them to limit the costs associated with nature and duration of treatment while, at the same time, attempting to avoid the liability of a medical malpractice suit.

A response to the crisis in market-based care has come to roost in Washington, D.C., as a result of constituent sentiment from across the country. Legislation has been introduced that would place restraints on HMOs, provide a "bill of rights"[11] to unhap-

---

**10.** In *Bowen*, the United States Department of Health and Human Services sued the state of Wisconsin, alleging that the state's system of administering Medicaid care was not in strict compliance with federal requirements. *See id.* at 392–93. As a result, the Department disallowed several reimbursements for the state's Medicaid expenditure. *See id.* at 393. The state responded that the Wisconsin system saved money and was in the best interest of its citizens. *See id.* at 394. Although the majority opinion supported the Department of Health and Human Services, the state's petition for certiorari was granted. *See* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987). However, a few days prior to oral argument before the Supreme Court, the Department settled with the state, thereby avoiding further consideration of the issue.

**11.** Indeed, many Americans view health care as a right: "Although the U.S. has currently opted for a market-based health care system, the public has shown by the recurrent eruptions of outrage that it views health care as a social good, and

py health care consumers, and even extend to HMO participants the power to individually sue their health plans for damages. *See* Laura Litvan, *Has Managed Care Hurt Quality?*, Investors Bus. Daily, May 1, 1998, at A1. This ability to sue may possibly serve in some measure to rectify the troubling state of affairs which currently exists, where patients can be without a remedy for medical malpractice. *See* Jamie Court, *Holding HMOs Accountable for their Egregious Conduct*, Chi. Trib., June 22, 1998, at 13 ("HMOs overturn doctors' decisions, deny treatment and then claim in court that they don't practice medicine, only provide coverage, so that HMOs cannot be sued for medical malpractice"). These proposals are still being debated in the committee hearing stage of the legislative process, and as yet have not been enacted to control the accelerated decline of our health care system.

Along the same lines as its "market forces" argument, the dissent submits that the defendants' plan "encourag[ed] physicians to use resources more efficiently." Although we agree, at least in principle, with the idea that financial incentives may very well bring about a more effective use of plan assets, we certainly are far from confident that it was at work in this particular case. The Carle health plan at issue was not used as efficiently as it should have been. Indeed, the eight-day delay in medical care, and the onset of peritonitis Herdrich incurred as a result of such delay in diagnosis, subjected her to a life-threatening illness, a longer period of hospitalization and treatment, more extensive, invasive and dangerous surgery, increased hospitalization costs, and a greater ingestion of prescription drugs.

The dissent also somehow contends that "ERISA tolerates some conflict of interest on the part of fiduciaries," and therefore, "allowing a plan sponsor to designate its own agent as a fiduciary reassures the sponsor that, in devoting its assets to the plan, it has not relinquished all ability to ensure that the plan's resources are used wisely." In so

doing, the dissent relies on two cases from this circuit, *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340 (7th Cir.1995), and *Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan*, 144 F.3d 1014 (7th Cir. 1998). In *Chalmers*, the plaintiff, Chalmers, a former officer of the defendant Quaker Oats Company, brought an ERISA action against the severance pay program of his former employer. *See* 61 F.3d at 1342. Chalmers challenged his denial of severance benefits, arguing that the program's severance committee's ruling should be reversed because its members, who were all officers of the Quaker Oats Company, operated under a conflict of interest. *See id.* at 1344. We held that an automatic bias did not exist against the distribution of severance benefits, in spite of the fact that the members of the severance benefit distribution committee were officers of the corporation. *See id.*

Similarly, in *Mers*, Dale Mers worked for the defendant Marriott International, Inc., and was a member of Marriott's accidental death and dismemberment insurance plan. *See* 144 F.3d at 1017–18. While participating in a company-sponsored volunteer project, he suffered a heart attack, fell to the ground, and expired a short time thereafter. Mers' wife, Pamela, submitted a proof of claim under the plan. In order to have qualified to receive benefits under Marriott's plan, the decedent's "injury" had to have been caused by an "accident." *See id.* at 1018–19. The plan insurer, American International Group ("AIG"), was given dual authority to serve both as plan insurer and the decision-maker in determining which claims qualified for payment. AIG denied Pamela the benefits she was seeking because, among other reasons, "the definition of injury found in the policies and the disease exception in ... [the] policy did not cover Dale Mers' death" and, in its view, "an accident did not cause his death." *Id.* at 1018–19. Pamela filed a complaint, asserting that Marriot wrongfully denied her claim, in violation of sections 502(a)(1)(B) and 1132(a)(1)(B) of ERISA.

even a right, not a commodity." Greene, *supra* at p. 375. While health care may not in fact be a right, the doctor's decision-making authority when administering treatment should not be cast asunder by an insurance company's mandate on

physicians that monetary concerns be placed above the quality of care, especially in those cases where the doctor is not even required to apprise the patient of more effective, but more expensive, options.

The district court, in granting the plan's motion for summary judgment, found that, although AIG's dual-role caused the insurer to operate under an inherent conflict of interest, the plan's denial of benefits was reasonable to the extent that Dale Mers' death was not an "injury" under the terms of the plan. *See id.* at 1019. We affirmed in *Mers,* but concluded that "no conflict of interest exists because paying meritorious claims is in AIG's best interest," that is, it would harm AIG in the long run to consistently deny valid claims "by inducing current customers to leave and by damaging its chances of acquiring new customers." *Id.* at 1020–21.

In considering our decisions in *Mers* and *Chalmers,* it is important to note that this court has heretofore not been called upon to address the situation where each and every member of the benefit plan's administrative review board were the very owners of the plan, and plan beneficiaries were without a single representative on the board. In our view, *Chalmers* and its ilk are distinguishable from the facts in this appeal because, whereas the members of the Quaker severance committee were all officers of Quaker, not one of the officers was an "owner" of, or had a direct financial interest in, the Quaker Oats Company, as was the case here. According to the record before us, the doctors who owned Carle and provided medical care to plan beneficiaries were the very same individuals who served as officers and directors of HAMP, the plan-administrating subsidiary of Carle. As the plaintiff alleged in her complaint, it is more likely than not that an incentive existed for the Carle doctors to abuse the dual loyalties that they observed in administering the Plan by "minimiz[ing] the use of diagnostic tests[,] . . . the use of facilities not owned by CARLE[,] . . . and the use of emergency and non-emergency consultation and/or referrals to non-contracted physicians."

The dissent implies that Herdrich's claim of breach should fail because, in *Chalmers,* we held that the severance benefits paid by Quaker officers, which were distributed from corporate earnings, did not give rise to a claim for breach of fiduciary duty. As this Court noted in *Chalmers,* "[Quaker] is a corporation which generates revenues of nearly $6 billion annually and is therefore not likely to flinch at paying out $240,000 [the amount in question in the *Chalmers* case]." 61 F.3d at 1344. The dissent attempts to liken the benefits distribution scheme in *Chalmers* to the one in this case by quoting the following language from *Chalmers*: "[I]t is also a poor business decision to make it a practice of resisting claims for benefits. In the long run, such a practice would dampen loyalties of current employees while hindering attempts to attract new talent." *Id.* Importantly, however, the officers in *Chalmers* who made the decision to distribute severance benefits were not the owners of the corporation. In fact, nothing in the facts of *Chalmers* leads us to infer that Quaker officers were shareholders, or even had an interest in the financial well-being of the company. Moreover, it is somewhat misleading to compare a $6 billion corporate entity like Quaker with HAMP, which holds less than $14 million in assets.[12] A doctor who is responsible for the real-life financial demands of providing for his or her family—sending four children to school (whether it be college, high school or primary school), making house payments, covering office overhead, and paying malpractice insurance—might very well "flinch" at the prospect of obtaining a relatively substantial bonus for himself or herself. *Here, the Carle physicians were intimately involved with the financial well-being of the enterprise in that the yearly "kickback" was paid to Carle physicians only if the annual expenditure made by physicians on benefits was less than total plan receipts. According to the complaint, Carle doctors stood to gain financially when they were able to limit treatments and referrals.* Due to the dual-loyalties at work, Carle doctors were faced with an incentive to limit costs so as to guarantee a greater kickback. In *Chalmers,* by comparison, the drain on profits resulting from a payout of benefits had no

---

12. While the record does not reflect exactly what HAMP's assets are, as of December 31, 1992, its largest affiliate and/or subsidiary corporation had assets totaling $13,847,000, which were admittedly more than HAMP's.

direct link at all to the officers' annual salaries.

In summary, we hold that the language of the plaintiff's complaint is sufficient in alleging that the defendants' incentive system depleted plan resources so as to benefit physicians who, coincidentally, administered the Plan, possibly to the detriment of their patients. The ultimate determination of whether the defendants violated their fiduciary obligations to act solely in the interest of the Plan participants and beneficiaries, *see* 29 U.S.C. § 1104(a)(1), must be left to the trial court. On the surface, it does not appear to us that it was in the interest of plan participants for the defendants to deplete the Plan's funds by way of year-end bonus payouts. Based on the record we have before us, we hold that the plaintiff has alleged sufficiently a breach of the defendants' fiduciary duty.

### 3. *Loss to Plan*

Finally, the defendants argue that Herdrich's claim must be dismissed because she does not allege that she suffered any loss attributable to the defendants' disputed breach. Specifically, they contend that beneficiaries in an ERISA plan may not recover anything other than the benefits provided expressly in the Plan itself. This is a mischaracterization of the law as it stands in this circuit.

ERISA allows any plan beneficiary to sue any plan fiduciary for breach of fiduciary duty. "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by [ERISA] shall be personally liable to make good to such plan any losses to the plan resulting from each such breach...." 29 U.S.C. § 1109(a). Furthermore:

A civil action may be brought—

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan....

*Id.* at § 1132(a). "There can be no disagreement ... that § [1132(a)] authorizes a beneficiary to bring an action against a fiduciary who has violated § [1109]." *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 140, 105 S.Ct. 3085, 3089, 87 L.Ed.2d 96 (1985). ERISA's "draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary." *Id.* 473 U.S. at 142, 105 S.Ct. at 3090 (footnote omitted). In such suits, plan beneficiaries have standing to bring an action on behalf of the plan itself to recoup monies expended in violation of ERISA, as the plaintiff has done here. *See* 29 U.S.C. § 1132(a). "[T]he fiduciary duties set forth in § [1109] run only to the plan, and not to individual beneficiaries." *Harsch v. Eisenberg,* 956 F.2d 651, 657 (7th Cir.1992) (citation and internal quotation omitted). In paragraph 13 of her complaint, Herdrich alleges that as a result of the defendants' actions, the Plan was deprived of the supplemental medical expense payment amounts in controversy. We thus hold that she has alleged with sufficient clarity that the Plan suffered a loss as a result of the defendants' actions.

### IV. CONCLUSION

We conclude that this court has jurisdiction to consider Herdrich's appeal and that the trial judge erred in dismissing the plaintiff's amended count III against the defendants for breach of fiduciary duty under ERISA. We reverse the district court's order dismissing the plaintiff's amended count III and remand for further proceedings consistent with this opinion.

REVERSED.

FLAUM, Circuit Judge, dissenting.

This is a case of first impression in which the plaintiff alleges that the imposition of financial incentives designed to limit the provision of health care benefits constitutes a breach of fiduciary duty under ERISA. The plaintiff's complaint alleges that there is a conflict of interest built into the compensation structure of the health plan in question. I fully accept the Majority's conclusion that,

taking the allegations of the complaint as true, "an incentive existed for [the defendants] to limit treatment and, in turn, HMO costs so as to ensure larger bonuses." Maj. Op. at 372. I disagree with the Majority's holding, however, that the mere existence of this asserted conflict, without more, gives rise to a cause of action for breach of fiduciary duty under ERISA. I respectfully dissent.

As described in the complaint, the defendants occupy two different roles in the health plan. The defendants are the plan's doctors, who provide medical care to the plan beneficiaries, and they are also the plan administrators, who (as fiduciaries) make decisions about what claims and conditions are covered under the plan. The complaint alleges that the defendants have breached their fiduciary duty in two ways. First, according to the complaint, the defendants have hired CARLE owner/physicians (*i.e.*, themselves) to provide medical services under the plan while cutting costs by minimizing the resources expended on each patient. By minimizing these expenditures, the defendants preserve funds to be distributed to themselves as year-end bonuses. Second, the complaint alleges that the defendants have administered disputed and non-routine claims. Again, the implication is that these claims are administered with an eye towards denying these claims to augment the defendants' year-end bonuses. Thus, the complaint alleges a structural incentive to deny care both at the point of delivery (*i.e.*, the treatment decisions affecting patient care) and at the point of entry (*i.e.*, the coverage decisions). In my view, however, merely pointing out the existence of these structural incentives does not suffice to make out a cause of action for breach of fiduciary duty under ERISA.

Consider first the defendants' alleged incentive to deny coverage in disputed and non-routine claims. Based on the allegations in the complaint, there is indeed an incentive to deny claims and thereby maintain large year-end bonuses. Unlike the common law of trusts, however, which is merely the baseline for determining the scope of fiduciary duty under ERISA, *see Varity Corp. v.*

*Howe*, 516 U.S. 489, 496–97, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), ERISA tolerates some conflict of interest on the part of fiduciaries. Most notably, section 408(c)(3) of ERISA permits an employer or other plan sponsor to have its own "officer, employee, agent, or other representative" serve as trustee or other fiduciary. 29 U.S.C. § 1108(c)(3). *See Donovan v. Bierwirth*, 538 F.Supp. 463, 468 (E.D.N.Y.1981) (describing § 408(c)(3) as "an unorthodox departure from the common law rule against dual loyalties"). One justification for this departure from the common-law tradition is that allowing a plan sponsor to designate its own agent as a fiduciary reassures the sponsor that, in devoting its assets to the plan, it has not relinquished all ability to ensure that the plan's resources are used wisely. This reassurance in turn encourages more employers and other sponsors to establish benefits plans. *See* Daniel Fischel & John Langbein, *ERISA's Fundamental Contradiction: The Exclusive Benefit Rule*, 55 U. Chi. L.Rev. 1105, 1127–28 (1988). Although the dual loyalty ascribed to the defendants in this case is not identical to the conflict experienced by a fiduciary who is also the sponsor's agent, section 408(c)(3) demonstrates that dual loyalties are not *per se* unlawful under ERISA.

Moreover, we have recognized in a related context that market forces help reduce the risk that the fiduciary's conflict of interest in making coverage decisions will work to the detriment of the plan and the plan beneficiaries. In reviewing denials of benefits under section 502(a)(1)(B) of ERISA, we are often confronted with situations in which the plan administrator had a financial incentive to deny claims. For instance, in *Chalmers v. Quaker Oats Company*, 61 F.3d 1340 (7th Cir.1995), the plaintiff argued that corporate officers who served on the plan administration committee had an automatic bias against dispensing severance benefits because those benefits would be paid directly from the corporation's earnings. *Id.* at 1344. In rejecting the plaintiff's claim of bias, we explained that "it is a poor business decision to make it a practice of resisting claims for benefits. In the long run, such a practice would dampen loyalties of current employees while hindering attempts to attract new talent." *Id.*; *see*

*also Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1051 (7th Cir. 1987). We have recently expanded on this rationale in finding that no conflict of interest existed when an insurer serving as a plan administrator denied a claim that, if it had been approved, would have been paid out of the insurer's assets:

> [I]t is a poor business decision to resist paying meritorious claims for benefits. Companies ... that sponsor ERISA plans are customers who choose which group insurance policies they will use to fund their plans.... [T]hese employers want to see their employees' claims granted because they want their employees satisfied with their fringe benefits. These corporate employers have the sophistication and bargaining power necessary to take their business elsewhere if an insurer ... consistently denies valid claims. In the long run, this type of practice would harm an insurer by inducing current customers to leave and by damaging its chances of acquiring new customers. Thus, no conflict of interest exists because paying meritorious claims is in [the insurer's] best interest.

*Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1020–21 (7th Cir.1998).

The reasoning regarding conflicts of interest in the denial of benefits context applies with equal force to the plaintiff's claim of breach of fiduciary duty. The sponsor of the plaintiff's plan, State Farm, is a sophisticated, experienced player in the market for health benefits. The defendants do have a financial interest in denying coverage, just as the corporation did in *Chalmers* and the insurer did in *Mers*. But State Farm has an interest in ensuring that its employees are satisfied with their fringe benefits, and the defendants have an interest in ensuring that State Farm is satisfied with the defendants' performance in delivering health care to the beneficiaries. In this sense, the interests of the administrator align with the interests of the beneficiaries and the sponsor. I recognize, of course, that monitoring of plan administrators by sponsors and beneficiaries is sometimes imperfect, and there is no guarantee that a sponsor will be able to find satisfactory alternatives in the marketplace. The plaintiff's complaint, however, alleges only that an incentive to deny coverage exists, which in my view is not enough to support an inference that market forces have failed in this case to protect the interests of beneficiaries.

The complaint's second allegation of breach of fiduciary duty, alleging an incentive to deny care at the point of delivery, also fails to state a claim upon which relief may be granted. As the Majority points out, such incentives are increasingly common in the age of managed care. Although the Majority identifies the potential pitfalls of managed care plans, *see* Maj. Op. at 374–77, there are also benefits to such plans that nevertheless make them attractive to many sponsors and beneficiaries of ERISA plans.[1] Since many

---

1. The goal of a managed care plan is to deliver health care more cost-effectively by eliminating unnecessary or ineffective treatments and providing necessary care more efficiently. Some plans, like the one addressed in this case, attempt to achieve these goals by introducing incentives that encourage physicians to internalize part of the costs of treatment. (According to the complaint, the instant plan contains a bonus structure that makes the physician's income depend in part on how efficiently the physician delivers care by minimizing expenditure of resources.) Other plans try to achieve efficiency goals by implementing utilization review procedures, in which the treating physician must obtain from the insurer advance approval of patient-care decisions. This method also has its drawbacks, especially when the reviewer lacks the medical expertise of the treating physician. *See generally* E. Haavi Morreim, *Diverse and Perverse Incentives of Managed Care: Bringing Patients into Alignment*, 1 Widener L. Symp J. 89, 91–95 (1996) (describing the variety of cost-containment techniques employed by managed care plans).

Of course, the desirability of these different cost-containment measures from a policy standpoint is not our concern. But in assessing the plaintiff's assertion that incentives alone constitute a breach of fiduciary duty, it is worth noting that some commentators defend the use of financial incentives as a superior alternative to utilization review by insurers. By removing the insurer as an intermediary in patient care decisions, financial incentives can give physicians greater clinical autonomy (provided that the incentives are set at an appropriate level) and may lead to better decisions about how to reduce costs while maintaining quality. *See* Frances H. Miller, *Capitation & Physician Autonomy: Master of the Universe or Just Another Prisoner's Dilemma?* 6

sponsors and beneficiaries of managed care plans view financial incentives as a desirable way of conserving the plan's assets by encouraging physicians to use resources more efficiently, merely alleging the existence of financial incentives to limit care cannot suffice to make out a claim of breach of fiduciary duty.

The complaint could be read to imply, however, that the defendants' incentives to limit care are so high that they work to the detriment of the plan and plan beneficiaries. When health plans provide physicians with incentives to internalize costs and maximize efficiency, as appears to be the case here, there is a serious concern that patient care will suffer if the incentives to limit care are set too high. The task of identifying appropriate limits for incentives is an important item on the legislative and regulatory agenda. *See, e.g.*, 42 U.S.C. § 1395mm(i)(8) (regulating the use of financial incentives by health care plans treating Medicare and Medicaid recipients); 42 C.F.R. § 417.479 (same); Edward B. Hirshfeld, *Provider Sponsored Organizations and Provider Service Networks—Rationale and Regulation*, 22 Am. J.L. & Med. 263 (1996) (discussing avenues for regulating provider sponsored organizations, or PSOs, which are physician groups that bear investment and insurance risk with respect to the delivery of health care services). If the complaint is indeed asserting that the incentives in this case are excessive, then the plaintiffs in effect are inviting the court to make its own determination about appropriate incentive levels in managed care.

In reversing the dismissal of the plaintiff's complaint, the Majority appears to accept this invitation. In my view, however, judicial efforts to determine permissible levels of fi-

nancial incentives through the vehicle of ERISA's fiduciary rules are unnecessary and ill-advised. No standards for conducting such an inquiry exist. Such a move would preempt legislative and regulatory efforts in this area and could seriously disrupt the ability of plan sponsors and beneficiaries to manage plan assets by agreeing to incentives that encourage cost-conscious medical decisionmaking. The Majority's decision provides little guidance for the district court on remand, and I fear that the decision today could lead, both in this case and in the future, to untethered judicial assessments of permissible incentive levels in health care plans.

Although I cannot join the Majority's decision in this case, I share the Majority's concern about the possibility of incentives that may harm plan beneficiaries, and I believe that courts have a role in ensuring that incentives are implemented in accordance with the fiduciary duties imposed by ERISA. In my judgment, this role is triggered when the market fails to ensure that the interests of sponsors, administrators, and beneficiaries are in alignment. As noted above, plan sponsors are likely to take their business elsewhere if they perceive that incentives are working to the detriment of beneficiaries or the plan itself, and thus market forces go a long way towards ensuring that incentives do not rise to dangerous or undesirable levels. In order for the market to function in this context, however, sponsors and beneficiaries need information about the financial incentives that are in place. Thus, I would follow the Eighth Circuit's lead in holding that the failure to disclose financial incentives is a breach of fiduciary duty under ERISA. *See Shea v. Esensten*, 107 F.3d 625 (8th Cir. 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 297, 139 L.Ed.2d 229 (1997).[2]

Health Matrix 89, 97–99 (1996); David Orentlicher, *Paying Physicians More to Do Less: Financial Incentives to Limit Care*, 30 U. Rich. L.Rev. 155, 173–77 (1996).

2. The Majority relies on *Shea* and another decision, *Ries v. Humana Health Plan, Inc.*, No. 94 C 6180, 1995 WL 669583 (N.D.Ill. Nov.8, 1995), in reversing the dismissal of the plaintiff's complaint. *See* Maj. Op. at 372–73. I do not believe that these cases aid the plaintiff. In both cases, there was a breach of fiduciary duty because the health plan failed to disclose to plan beneficiaries the existence of financial arrangements between the plan and health care providers that allegedly operated to the detriment of the beneficiaries. *See Shea*, 107 F.3d at 628; *Ries*, 1995 WL 669583 at *2, *7. The complaint in the instant case, however, never asserts that the plaintiff's health plan failed to disclose the financial incentives under which its physicians were operating. Thus, these disclosure cases are inapposite to the plaintiff's theory, which appears to be that the mere existence of such incentives (or, at least,

384

Until the Majority's expansion of liability in today's case, *Shea* stood at the frontier in terms of imposing liability under ERISA on health plans that seek to control costs by providing financial incentives to limit patient care. The *Shea* decision has proven to be controversial. *See, e.g., Weiss v. CIGNA Healthcare, Inc.*, 972 F.Supp. 748, 754–55 (S.D.N.Y.1997) (rejecting *Shea* and holding that there is no fiduciary duty under ERISA to disclose financial incentives to limit care); *see also* "Full Disclosure," ERISA LITIGATION REPORTER, April 1997 at 3 (describing *Shea* as "a decision that has been getting a lot of notice" and as a "far-reaching example" of "the expansion of disclosure duties into non-benefits contexts"). The Second Circuit has obliquely adopted *Shea's* rationale, however, in a decision upholding the denial of a motion for preliminary injunction. *See Maltz v. Aetna Health Plans*, 114 F.3d 9, 11–12 (2d Cir.1997). The health plan at issue in *Maltz* had been paying its participating physicians on a fee-for-service basis. When the health plan decided to switch to a capitation method of payment—which created a financial incentive to limit care by paying the physician a flat monthly fee for each enrollee on his or her list—the plaintiff-beneficiary sued for a breach of fiduciary duty under ERISA. The Second Circuit held that the plaintiff failed to demonstrate irreparable harm or a likelihood of success on the merits:

> [We] certainly acknowledge that incentive programs may affect the decisions physicians make in the treatment of their patients. Nothing in the contract between Aetna and its enrollees, however, limits Aetna's ability to make significant changes in its relationship with its doctors as long as the enrollees are aware of the changes when they renew their contract with Aetna and Aetna provides them with competent, alternative physicians.... Maltz renewed her contract with Aetna with full knowledge of these significant changes.

*Id.* at 12. Although the posture of *Maltz* as a preliminary injunction case makes it difficult to discern how the court would ultimately rule on the merits, the *Maltz* opinion suggests at least a tentative acceptance of *Shea's* holding that nondisclosure of financial

incentives that a court might feel are excessive)

incentives to limit care may constitute a breach of fiduciary duty under ERISA.

Even when disclosures have been made, I would not rule out the possibility that the imposition of incentives to limit care could support a claim of breach of fiduciary duty when there is a serious flaw in the manner in which the incentive arrangement is established or a significant limitation on the ability of plan sponsors to obtain alternative arrangements in the market. Such a claim would have to make some allegation, which the plaintiffs in the instant case do not, pointing to special circumstances suggesting a breakdown in the market or in the negotiating process that led to the imposition of incentives. The complaint in this case, however, contains no allegation of nondisclosure, and it fails to make any allegations suggesting that the financial incentives to limit care are anything but the result of the bargain fairly struck between the plan's sponsor, administrator, and beneficiaries. I would affirm the decision below dismissing the complaint.

constitutes a breach of fiduciary duty.