**Albert C. McNAB, et al., Plaintiffs–Appellants,**

v.

**GENERAL MOTORS CORPORATION, Defendant–Appellee.**

No. 98–1041.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 11, 1998.

Decided Dec. 11, 1998.

Raymond J. Hafsten, Jr. (argued), Indianapolis, IN, for Plaintiffs–Appellants.

David M. Davis (argued), Hardy, Lewis, Pollard & Page, Birmingham, MI, for Defendant–Appellee.

Before POSNER, Chief Judge, and BAUER and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Like many other firms, General Motors Corporation uses early-retirement programs to reduce its workforce without resorting to involuntary separation. One problem with early-retirement systems, however, is that the best employees may leap at the opportunity, knowing that they can add income from other jobs to their retirement packages; the firm wants to keep these superior employees while shedding those who are not up to snuff, but the sub-par workers are less willing to go, because they may value sinecures and do not expect to find comparable employment elsewhere. If the firm augments the early-retirement incentive to make it attractive to employees who lack prospects of finding other jobs, then the best employees have even more reason to take the offer. To overcome this problem of adverse selection, firms may limit early-retirement programs to employees chosen by management. Managers offer the package to the weakest members of the staff, simultaneously cutting their unit's budget and improving the average quality of its workers. But good workers may take exclusion poorly; why, they may ask, should rewards vary inversely with quality? Resentment may lead to litigation. In this case 13 employees at the Allison Gas Turbine division of General Motors, told that they were too valuable to let go, contend that the Employee Retirement Income Security Act (ERISA) forbids GM to implement an early-retirement system that leaves participation to the discretion of managers. Although they do not say that discretion is always forbidden, they do contend that it must be exercised so that every similar case company-wide is treated identically. Because this is impossible at any large company, their position is functionally equivalent to an argument that ERISA forbids discretionary early-retirement programs.

In January 1992 GM adopted what it called the "1992 Corporate Window Retirement Program" under which the early-retirement age was decreased from 55 to 53, and the retirement package was sweetened by computing benefits without reduction for the earlier age of retirement or earnings at other jobs. Later in 1992 GM dropped the minimum age from 53 to 50. Early retirement was particularly attractive to employees at the Allison Gas Turbine division, which GM was trying to sell. Some employees were uncertain about their future and perceived early retirement as a source of guaranteed income; others saw it as a means to increase their income, for they could "retire" from GM and draw a pension while remaining employed full time at the newly constituted Allison Engine Company (which was spun off as an independent firm late in 1993). But under the 1992 program early retirement was possible only if GM and the employee agreed, and GM reserved the right to choose according to "GM's best interest". Plant per-

sonnel directors sent lists of candidates to the Management Committee of GM's board, which made the final decision.

None of our plaintiffs was selected by Allison's management, which wanted to keep its best workers in order to facilitate the impending sale. Appeals to the Management Committee were unsuccessful. For example, plaintiff Michael Asher related that he was told "that the best employees were being kept because any prospective buyer of the Company needed an experienced workforce. Three times during the meeting, Dr. Wallace told me that I was 'invaluable to the Company.' I was considered to be 'a long term fit in the organization' and not considered to be 'excess to the needs of the organization.'" Plaintiff Nicholas Schmutte was not recommended because managers had been "told that any positions vacated by the incentive separation were not to be replaced. At the time the Contracts Department [in which Schmutte worked] was unable to meet all of the demands with the people on board, let alone with one [fewer]." The district court concluded that none of GM's choices could be called "arbitrary and capricious," the right standard for judicial review of an operational decision under a plan that expressly gives the administrator discretion. 987 F.Supp. 1115 (S.D.Ind.1997). See *Krawczyk v. Harnischfeger Corp.*, 41 F.3d 276, 278–79 (7th Cir.1994); *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir.1985).

■ Plaintiffs do not contend that GM's stated reasons were mistaken, let alone arbitrary and capricious. They do not argue that the Contracts Department was overstaffed or that they were "excess to the needs of" GM— that any reasonable decisionmaker at GM would have been bound to consider them deadwood. Instead they maintain that decisions under the programs were not strictly according to inverse rankings of performance. One employee was given early retirement to avoid a threat of litigation; another was allowed to retire so that he could stay home with his ill wife; another because he had hypertension; another was a manager so senior that he could put his own name on the list; still others were (as plaintiffs see things) as valuable to GM as plaintiffs them-

selves. Plaintiffs' reply brief sums up their position: managers "deviate[d] from the ... Plan's stated purpose [and] made selection decisions based upon cronyism, whimsy and personal notions of honor, duty and fairness. They also reversed nonselection decisions ... for hidden and undisclosed reasons e.g. threats of litigation, complaints of discrimination, cronyism, complaints of health problems."

■ It is more than a little difficult to see why plaintiffs, whose applications were correctly denied under the program's stated criteria, should be entitled to relief because GM was unduly generous with other employees. If this were a medical benefits program, would one decision to pay for an uncovered medical procedure (say, a dental implant in lieu of a bridge) entitle every other employee to reimbursement for that procedure? An employer is supposed to apply the plan's written terms, and departure from those terms on one occasion does not estop the employer to enforce them on others. See *Frahm v. Equitable Life Assurance Society*, 137 F.3d 955 (7th Cir.1998). Plaintiffs suggest that every divergence from a plan's criteria is an "amendment" of the plan entitling them to the same benefits, but that is a non-starter, rejected in *Frahm*. Amendments are accomplished through a formal process and produce a revised written instrument. *Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). Deviations from a plan are just that—deviations. The plan remains what it was, and claims for benefits continue to be evaluated in light of its written criteria.

But plaintiffs' position has a deeper problem. There's nothing wrong under ERISA with a system that gives plan administrators discretion. Subject to a few explicit rules in the statute, an employer may design a pension or welfare plan with features of its choosing, provided it is willing to pay the cost. *Lockheed Corp. v. Spink*, 517 U.S. 882, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996); *Johnson v. Georgia–Pacific Corp.*, 19 F.3d 1184 (7th Cir.1994); *McGath v. Auto–Body North Shore, Inc.*, 7 F.3d 665 (7th Cir.1993). See also *Henn v. National Geographic Society*, 819 F.2d 824 (7th Cir.1987) (no problem

under age discrimination laws either, provided early retirement is voluntary). Plaintiffs concede that GM is entitled to adopt an early-retirement plan under which the eligibility standard is the best interests of GM, as GM's board of directors sees those interests. This is exactly what GM did, having put up the extra money necessary to pay for the benefits. If it is lawful to adopt a plan that gives discretion to senior managers, it must be lawful to *use* that discretion to evaluate what the "best interests" of a firm are. Managers may conclude that it is in the best interest of a firm to allow employees to assist stricken family members or retire early when in ill health; benevolent employment policies make it easier for the firm to attract good workers, and to keep them at lower salaries than Simon Legree Mfg., Inc., must pay. Managers may conclude that it is cheaper (and hence in the best interest of the firm) to let a given worker retire early than to underwrite the costs of defending a lawsuit, for even weak suits may require steep attorneys' fees to achieve victory. (This suit is a good example of that fact.) Because GM is such a large corporation, different managers at different plants (even different managers at the same plant) are bound to interpret the "best interests" of the firm differently. That is the inevitable result of choosing a *standard* (such as "best interests of the firm") rather than a *rule* (such as "in the bottom 20% according to last year's performance evaluations"). Flexibility is doubtless the reason GM adopted a standard rather than a rule; flexible administration therefore cannot be the program's undoing, or we have simply used an under-the-table method to make discretion unlawful, contradicting the conclusion that ERISA permits discretionary plans.

Discretion might be curtailed and the results made more consistent by having a single decisionmaker. But that's not feasible for a large organization such as GM and at any event would not eliminate plaintiffs' beef. What might appear to GM's early-retirement czar as compassion (the health cases) or thrift (the litigation-settlement cases) might appear to plaintiffs as "cronyism"—for they might not be privy to the factors that influenced the decision or might weigh them differently from the plan administrator. "Cro-nyism" is just an epithet plaintiffs attach to decisions they do not understand or approve. Using a district judge as arbiter of such disputes would compromise the discretionary nature of the program or appoint the judge as the plan's real early-retirement czar. ERISA does not require the former and does not permit the latter. No surprise, then, that courts have invariably rejected challenges to discretionary decisions made under earlier versions of GM's early-retirement plan, *Bair v. General Motors Corp.*, 895 F.2d 1094 (6th Cir.1990); *Valz v. General Motors Corp.*, No. 88–1794, 1988 WL 150794 (8th Cir. Dec.22, 1988) (unpublished order); *Friesen v. General Motors Corp.*, 759 F.Supp. 560 (E.D.Mo.1991); *Jewell v. Chevrolet Motors Division of General Motors Corp.*, Civ. No. 90–0689–B(CM) (S.D.Cal. Feb. 11, 1991), as well as under comparable plans at other firms. E.g., *Averhart v. US WEST Management Pension Plan*, 46 F.3d 1480, 1488 (10th Cir.1994); *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 918–19 (3d Cir.1990); *Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 283–84 (3d Cir.1988). Our decision in *Fletcher v. Kroger Co.*, 942 F.2d 1137 (7th Cir.1991), is in the same vein. Plaintiffs' protest to the 1992–93 edition of GM's plan meets the same fate.

AFFIRMED.