■ SUSAN JONES et al., Appellants, v U.S. HEALTHCARE et al., Respondents. [723 NYS2d 478] —Order, Supreme Court, Bronx County (Alan Saks, J.), entered January 19, 1999, which, in an action for medical malpractice, insofar as appealed from, granted the motion of defendant health maintenance organization for summary judgment dismissing the complaint as against it, affirmed, without costs.

Defendant movant cannot be held vicariously liable for defendant doctors' and hospital's alleged malpractice in discharging plaintiff and her baby prematurely, where the documentary evidence, including, in particular, plaintiff's Group Master Contract, membership card and Member Handbook, clearly states that doctors and hospitals participating in defendant's health care program are independent contractors (*see, Hill v St. Clare's Hosp.*, 67 NY2d 72, 79-81). While it does appear that defendant's program contemplated a hospital stay of no more than 24 hours for a normal vaginal delivery, it remains a fact, established by documentary evidence and defendant doctors' admissions, that the treating doctors had full authority to decide when the mother and/or baby could be discharged, and that a stay of more than 24 hours would be covered if medically justified.

As to the dissent's assertion that summary judgment should be denied because defendant was guilty of "abetting the unauthorized practice of medicine" by "[e]mploying a nursing service to perform a function requiring diagnostic skills [of a physician]," plaintiff did not advance this as a ground for liability before Supreme Court or, for that matter, before this Court. In view of this, we are precluded from considering this theory of liability *sua sponte* (*see, Lichtman v Grossbard*, 73 NY2d 792, 794; *Lefkowitz v Lebensfeld*, 51 NY2d 442, 447-448; *Wells v Fisher*, 237 NY 79, 84; *Lindgren v New York City Hous. Auth.*, 269 AD2d 299; *Matter of Travelers Indem. Co. [Levy]*, 195 AD2d 35, 41). Moreover, even if we were to consider this theory, the record does not support the view that the nurse was sent in lieu of a physician or that she performed services outside the scope of her licensure.

We have examined plaintiffs' remaining contentions and find them to be without merit. Concur—Rosenberger, J. P., Tom and Friedman, JJ.

Ellerin and Rubin, JJ., dissent in a memorandum by Rubin, J., as follows: Plaintiff appeals from an order granting the motion of defendant U.S. Healthcare for summary judgment dismissing the complaint. While the statutory ground for the motion is unspecified, the notice of motion avers that, "as a matter of law, there is no factual or legal basis for liability of U.S. Healthcare to plaintiffs." Movant therefore takes the position that "the pleading fails to state a cause of action" (CPLR 3211 [a] [7]) and, indeed, Supreme Court dismissed the complaint on the ground that no legal duty is owed to plaintiff upon which relief can be granted.

Plaintiff alleges that defendant health maintenance organization (HMO) so structured its perinatal care program that plaintiff's decedent, Bryan Jones, was caused "to receive improper medical and hospital care and treatment" at the hands of "incompetent and/or unskilled medical professionals." Expressing the substance of the complaint somewhat differently, Supreme Court granted summary judgment to defendant on the ground that the HMO's failure to "provide coverage for procedures the plaintiff contends are medically necessary does not expose it to liability for a health care provider's alleged failure to render adequate treatment because it will not be covered."

Upon review of the record, I conclude that the basis of liability is not the withholding of treatment, but the substitution of the services of an unqualified practitioner for those of a physician. While the HMO is not liable for the medical mal-

practice of an independent contractor, it has not been established that the law goes so far as to provide immunity for ordinary negligence in engaging the services of a health care provider that is unauthorized to render the requisite medical care. I do not share the majority's implicit conclusion that an HMO cannot be held liable even for acts which contravene State law. Therefore, I respectfully dissent.

## The Facts

Plaintiff makes the following allegations, which are largely undisputed. The decedent, Bryan Jones, was born to plaintiff Susan Jones on April 17, 1994 at defendant Winthrop University Hospital. The delivery was normal, and mother and son were discharged 28 hours after the birth. Once home, plaintiff noticed that the child slept frequently, exhibited no interest in nursing, had blotchy skin, low urine output and unusual breathing. On April 20, plaintiff related her observations to a pediatric nurse employed by defendant New York Home I.V., who was making a home visit as part of U.S. Healthcare's "L'il Appleseed" perinatal care program. The nurse assured plaintiff that the baby was in all respects normal, and the lone abnormality noted in her report is "mild jaundice." Plaintiff then contacted defendant doctors and was told that, if the problems persisted, she should bring the child to the office the next morning.

Several hours later, after the infant's breathing became labored, he was taken to the emergency room of defendant Winthrop University Hospital, where an endocardiogram revealed that he was afflicted with hypoplastic left heart syndrome (a nonfunctioning left ventricle). It took two more days to effect his transfer to Columbia-Presbyterian Medical Center, where the necessary procedure to repair the heart defect was eventually performed, because defendant U.S. Healthcare opposed the move and refused to pay for treatment, even as a secondary carrier. Although Bryan was transferred on April 22, 1994, surgery could not be performed until May 1, when his condition had been sufficiently stabilized. The infant was readmitted to Winthrop University Hospital on May 10 for follow-up care and was ultimately discharged on May 28. He was again seen at Winthrop on August 25 because he was not eating and was discharged the following day with the diagnosis of gastroenteritis. The same complaint prompted his return to the hospital on August 27, at which time he was intubated because his oxygen saturation level was found to be low. He went into cardiac arrest and died the following day.

Defendant U.S. Healthcare's actions in response to the crisis only served to exacerbate an already dire situation. The same bureaucracy responsible for the treatment regimen that caused the fatal heart defect to go undetected also proved to be indifferent and even obstructive towards plaintiff's efforts to obtain remedial intervention. Apparently, doctors at Winthrop University Hospital advised plaintiff and her husband that Bryan needed immediate surgery (the Norwood procedure) and recommended that it be performed by a Dr. Quaegebeur at Columbia-Presbyterian Medical Center. When plaintiff contacted U.S. Healthcare, she was immediately quizzed about why she had gone to Winthrop University Hospital without a referral from her primary care physician. Her request for transfer to Columbia-Presbyterian was met with the suggestion that Bryan instead be transferred to Long Island Jewish Hospital, which is affiliated with the U.S. Healthcare network. Informed that its success rate with the surgery was somewhat lower than Columbia-Presbyterian's, plaintiff declined the offer. Instead, she arranged for her husband's medical insurer, Blue Cross/Blue Shield, to become decedent's primary insurer and to provide a source of payment to Columbia-Presbyterian Medical Center. When she again contacted U.S. Healthcare to request coverage for the deductible and for the percentage of the costs not covered by Blue Cross/Blue Shield, plaintiff was told that U.S. Healthcare would not assume the cost of any treatment at Columbia-Presbyterian because it did not consider the admission to be an emergency.

## U.S. Healthcare's L'il Appleseed Program

Defendant HMO provides maternity care under its "L'il Appleseed" program. The record contains the Member Handbook and Member Directory, which describe this and various other health and nutrition programs. These publications both contain a statement to the effect that "U.S. Healthcare's L'il Appleseed Program provides * * * a postdelivery, home care nurse visit." A letter sent to plaintiff several weeks prior to her delivery date indicates that the visit by the nurse should be arranged through "the L'il Appleseed department." Also contained in the record is a sample (unexecuted) copy of defendant HMO's group master contract, which states (at 27), "No Participating Provider or other provider, institution, facility or agency is an agent or employee of HMO." "Provider" is broadly defined to include any "Physician, Health Professional, Hospital, Skilled Nursing Facility, Home Health Agency or other entity or person providing services to Members under this contract." The

Member Handbook states that participating physicians "are neither employees nor agents of U.S. Healthcare" and, among the "conditions of enrollment," contains the provision: "You acknowledge that U.S. Healthcare's participating providers, including all participating primary care physicians, are independent contractors and are not agents or employees of U.S. Healthcare."

The complaint charges U.S. Healthcare with "negligently promulgating rules and regulations which caused plaintiff and plaintiff's decedent to receive improper medical and hospital care and treatment." Liability is predicated on the HMO maternity care plan provision limiting the postpartum hospital stay to 24 hours in the case of a normal delivery without apparent complications. This policy is reflected in a letter sent to participating physicians dated May 21, 1993, announcing that U.S. Healthcare is "expanding the scope of our maternal/child U.S. L'il Appleseed program." The letter represents that "both the American College of Obstetrics and Gynecology and the American Academy of Pediatrics have endorsed this position, provided appropriate medical criteria are met."

The record contains excerpts from a pamphlet entitled Guidelines for Perinatal Care (3d ed), published jointly by the American College of Obstetrics and Gynecology and the American Academy of Pediatrics, which was cited by the HMO in its letter to physicians. In its affidavit in support of its motion for summary judgment, the HMO professes to have "followed the 1992 guidelines," relying on them "to formulate its enhanced L'il Appleseed Program benefits in 1993." The affidavit concedes that "[t]he same guidelines were in effect in April 1994, when Bryan Jones was born."

Contrary to both the HMO's position on this appeal and the impression conveyed by its letter to participating physicians, the views expressed by the medical societies in their pamphlet fall far short of even a qualified endorsement of such early discharge programs. The publication states, "When no complications are present, the postpartum hospital stay ranges from 48 hours for vaginal delivery to 96 hours for cesarean birth." The authors' reservations about early discharge policies are evident: "Because many neonatal problems do not become apparent until several days after birth, there is an element of medical risk in early neo-natal discharge. Although most problems are manifest during the first 6 hours, data suggest that readmissions may be more common when early (by 48 hours) or very early (within 24 hours) discharge programs are instituted." Among the criteria for early discharge, the pamphlet states, "A

physician-directed source of continuing medical care for both mother and baby should be identified and arrangements made for the baby to be examined within 48 hours after discharge." At this follow-up visit, the assessments to be made include "[e]valuation of condition by history and physical examination" and "[r]eview of laboratory data obtained before discharge."

Whether or not the medical societies may be said to have endorsed "early" neonatal discharge, it is clear that under either an "early" or a "very early" discharge program, such as U.S. Healthcare's L'il Appleseed program, a follow-up examination is indicated. Furthermore, the procedure to be followed, which includes "physician-directed" medical care, "[p]hysical examination" and "[r]eview of laboratory data," clearly contemplates assessment by a trained diagnostician. Thus, the examination is not one normally within the expertise of a nurse, whose diagnostic function is limited to "identification of and discrimination between physical and psychosocial signs and symptoms essential to effective execution and management of the nursing regimen. Such diagnostic privilege is distinct from a medical diagnosis" (Education Law § 6901 [1]). However, the functions of a qualified "nurse practitioner" (Education Law § 6910) "may include the diagnosis of illness and physical conditions and the performance of therapeutic and corrective measures within a specialty area of practice, in collaboration with a licensed physician qualified to collaborate in the specialty involved, provided such services are performed in accordance with a written practice agreement and written practice protocols" (Education Law § 6902 [3] [a]).

No documentation pertaining to such a practice agreement or protocols is contained in the record. However, U.S. Healthcare's Primary Office Procedure Manual states that, under its "L'il Appleseed Program," "a Pediatric Nurse Practitioner or Family Nurse Practitioner will arrange a home visit with the member." This suggests that the pediatric nurse who visited Bryan Jones might have been authorized to render a diagnosis within her area of specialization, assuming the statutory prerequisites had been fulfilled (Education Law § 6902 [3] [a]; § 6910). Given the state of the record, however, both the propriety of the nurse's examination and the identity of the supervising physician remain questions of fact.

## The Sufficiency of the Complaint

U.S. Healthcare takes the position that it bears no responsibility for decisions that were made by independent contractors with respect to the treatment of plaintiff's decedent. Lawsuits

grounded in malpractice are barred by State law because the HMO, by definition, is not engaged in the practice of medicine (Public Health Law § 4410 [1]). Furthermore, State law claims arising out of "any administrative determination relating to the plan or the extent of its benefits" are barred by the preemption provisions of the Employee Retirement Income Security Act of 1974 (29 USC § 1001 *et seq.* [ERISA]; *see, Tufino v New York Hotel & Motel Trades Council & Hotel Assns.*, 223 AD2d 245, 250; *see, Shea v Esensten*, 107 F3d 625, 627 [8th Cir], *cert denied* 522 US 914), which recite that it shall "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" (29 USC § 1144 [a]). ERISA does not preempt malpractice actions and related claims against physicians (*Nealy v U.S. Healthcare*, 93 NY2d 209, 217-218), and New York State law holds an HMO vicariously liable for the acts of its physician agents (*Tufino, supra*, at 250; *see also, Wisholek v Douglas*, 280 AD2d 220), but not those of independent contractors.

The literature furnished to plan members and the provider agreements with defendant physicians specify that doctors and nurses participating in U.S. Healthcare's health maintenance plan are independent contractors. If the HMO "did not exercise actual or constructive control over the performance and manner in which the work * * * was performed," it cannot be held vicariously liable (*Lazo v Mak's Trading Co.*, 84 NY2d 896, *affg* 199 AD2d 165). The operative criterion governing the imposition of vicarious liability for medical malpractice is agency or control in fact (*Hill v St. Clare's Hosp.*, 67 NY2d 72, 79).

U.S. Healthcare maintains that nothing in its policies and procedures requires a participating physician to discharge a patient when, in the exercise of professional judgment, further hospital treatment is indicated. Therefore, it intimates that the death of plaintiff's decedent is the result of some lapse in professional judgment by plaintiff's doctors or by the visiting nurse. However, construing the facts in a light favorable to plaintiff, as the Court is required to do on a motion seeking to dismiss the complaint or for summary judgment (*Ingle v Glamore Motor Sales*, 73 NY2d 183, 194; *Crosland v New York City Tr. Auth.*, 68 NY2d 165, 168, n 2; *see also, Corinno Civetta Constr. Corp. v City of New York*, 67 NY2d 297, 316; *Martin v Briggs*, 235 AD2d 192, 196), the record suggests that the infant's condition was simply not manifest at the time of his discharge from the hospital on April 18, 1994 and only became apparent two days later, at which time plaintiff and the infant were visited by the nurse provided under U.S. Healthcare's L'il

Appleseed program. Plaintiff alleges that the nurse failed to recognize the infant's distress or, upon being informed of plaintiff's observations, to refer plaintiff to a physician, omissions alleged to comprise a deviation from sound and accepted medical practice.

The record, as noted, does not establish that the nurse was capable of diagnosing decedent's condition. It is clear, however, that U.S. Healthcare did not provide the option of having the prescribed examination conducted by an obstetrician or pediatrician. It appears that U.S. Healthcare arranged for a nurse to be dispatched to perform a diagnostic function that, by statute, expressly requires the expertise of a physician, who is the only medical professional authorized by New York law to render a diagnosis (Education Law §§ 6521, 6522). Although she might be faulted for failing to recognize the infant's distress or to seek qualified medical intervention (Education Law § 6901 [1]; § 6902 [1]), it would be anomalous to subject a nurse to a claim of medical malpractice for failing to render a diagnosis that, by law, she is neither qualified nor authorized to make (Education Law §§ 6522, 6909 [2]).

We thus arrive at the most troubling aspect of this case, which is simply that there may have been no medical malpractice. The reason, of course, is that U.S. Healthcare devised a perinatal care program that omitted the requisite examination by a qualified medical professional. Nor is this omission necessarily inadvertent. In the macabre economics of managed care, a condition the HMO's physicians do not discover is a condition the HMO does not have to pay for. If the organization's physicians are deprived of the opportunity to diagnose a condition, it almost certainly will not be discovered, and the HMO can be reasonably confident that it will not have to bear the cost of any necessary treatment. As the majority's view aptly illustrates, neither is the HMO likely to be deterred by the prospect of being held accountable for any injury sustained by the patient.

## Managed Care

The HMO concept is the result of the outcry against rapidly rising health care costs associated with the traditional fee-for-service approach to the provision of medical services. In the words of one court: "The HMO structure differs substantially from traditional fee-for-service medicine in giving the HMO an incentive to skimp on care once an illness is discovered. It is equally true that the HMO system creates an inducement to keep the subscribers healthy as long as possible. An HMO

makes its profit from healthy subscribers and thus provides ample preventive and diagnostic care, while many fee-for-service physicians make their living from sick or injured persons" (*Herdrich v Pegram*, 170 F3d 683, 684 [7th Cir 1999; Easterbrook, J., dissenting], *revd* 530 US 211). The argument in support of the managed care approach to medicine is that it gives the physician an incentive to keep patients healthy, in other words, to practice and promote "wellness." The argument against managed care is that it includes a disincentive to provide aggressive treatment for any illness that might be diagnosed.

If the intent of managed care is to promote "wellness," the objective is presumably to foster the availability of basic medical care in order to prevent illness, that is, to encourage the practice of preventive medicine. Failing prevention, the goal is presumably to ensure early detection of disease before a medical condition progresses and requires extensive (and expensive) measures. However, this case and others provide at least anecdotal evidence that this goal is not being met and that basic preventive care and prompt medical intervention are being sacrificed to pare costs and promote profit.\*

In *Shea v Esensten* (107 F3d 625, *supra*), forty-year-old Patrick Shea consulted his family doctor after being hospitalized overseas for severe chest pains. Although he presented with "chest pains, shortness of breath, muscle tingling, and dizziness," related "his extensive family history of heart disease" and even offered to bear the cost of treatment by a specialist out-of-pocket, he was unable to obtain a referral to a cardiologist from his physician (*supra*, at 626). Several months later, he succumbed to heart failure.

Similarly, in *Herdrich v Pegram* (154 F3d 362, *reh denied* 170 F3d 683, *revd* 530 US 211), the plaintiff consulted her doctor complaining of pain in the midline of her abdomen. Even "after finding an inflamed mass in her abdomen," the doctor required her to wait eight days for an ultrasound examination at a distant HMO-approved facility, rather than schedule the procedure immediately at an unaffiliated local hospital (*supra*, at 684). In the interim, the plaintiff's appendix ruptured, as a result of which she contracted peritonitis.

Significantly, these cases do not involve any expensive, ex-

---

\* A recent New York Times article cited a lawsuit brought by the Connecticut State Medical Society seeking to enjoin Aetna U.S. Healthcare, among other HMO's, from engaging in " 'unfair, deceptive, improper practices' that place profit above patients' welfare" (Zielhauer, *Doctors Sue Health Plans Over Coverage*, New York Times, Feb. 15, 2001, at B1, col 5).

perimental or extreme measure for which the HMO declined payment. Rather, in each case, the HMO failed to provide the patient with routine preventive care that was clearly appropriate under the circumstances. Inadvertently, managed care legislation seems to have fostered an environment in which legal protection and economic forces combine to impel HMO's to confine the delivery of medical care to those patients who don't need it.

An HMO is not subject to liability for injury that results from the withholding of medical care, whether it results from an administrative determination by the HMO or a treatment decision made by a participating physician. In *Pegram v Herdrich* (*supra*, 530 US, at 226), the United States Supreme Court rejected a direct action against an HMO that predicated liability on the theory that certain "decisions affecting medical treatment," alleged to have been made by the HMO through one of its physician owners, breached the HMO's fiduciary duty to plan participants under ERISA (29 USC § 1109 [a]). The Court reasoned that so-called "eligibility decisions cannot be untangled from physicians' judgments about reasonable medical treatment" (*supra*, 530 US, at 229). It stated that the fiduciary standard proposed by the plaintiff "would be nothing but the malpractice standard traditionally applied in actions against physicians" (*supra*, 530 US, at 235). While acknowledging that "in States that do not allow malpractice actions against HMOs the fiduciary claim would offer a plaintiff a further defendant to be sued for direct liability" (*supra*, 530 US, at 235-236), it noted that "the physician employee would also be subject to liability as a fiduciary on the same basic analysis that would charge the HMO" (*supra*, at 236). The Court concluded, "On its face, federal fiduciary law applying a malpractice standard would seem to be a prescription for preemption of state malpractice law, since the new ERISA cause of action would cover the subject of a state-law malpractice claim" (*id.*).

As to the propriety of a particular HMO's medical provider's reimbursement plan, the opinion states that any attempt by the courts to define what constitutes an acceptable organizational structure would entail "a judgment about the appropriate level of expenditure for health care in light of the associated malpractice risk" (*supra*, 530 US, at 221). The Legislature is the "preferable forum for comprehensive investigations and judgments of social value, such as optimum treatment levels and health care expenditure" (*id.*).

In the matter at bar, the allegations of the complaint

concerning the brief duration of hospital care and the denial of payment for remedial treatment of plaintiff's decedent at Columbia-Presbyterian Medical Center both implicate an "administrative determination relating to the plan or the extent of its benefits" (*Tufino v New York Hotel & Motel Trades Council*, 223 AD2d 245, 250, *supra*). Thus, these acts or omissions, ill-conceived and harmful though they might have been, fall within the purview of the broad preemption provision of ERISA (29 USC § 1144 [a]; *see, Shea v Esensten, supra*, at 627). They therefore pertain to matters which, as indicated in *Pegram (supra)*, are within the exclusive province of the Legislature (*cf., Pappas v Asbel*,768 A2d 1089 [Sup Ct Pa] [upholding State medical malpractice action against HMO for delay in authorizing referral to treating hospital]).

Discharging mother and child a mere 24 hours after delivery is no longer an acceptable practice in this State. Included in the record is the transcript of testimony given by John Richard Stafford, Jr., M.D., before the New York State Senate during a hearing on proposed legislation (since enacted) to require health maintenance organizations to provide coverage for at least two days' hospitalization following a normal delivery. The witness indicated that 24 hours is an inadequate period within which "to observe an infant for the onset of many potentially life-threatening conditions" and specified congenital heart disease among the complications that may "present in the period beyond the first twenty-four hours of life." The Legislature subsequently approved a measure requiring hospital inpatient care "for not less than forty-eight hours after childbirth for any delivery other than caesarean section, and for more than forty-eight hours when medically necessary" (Public Health Law § 2803-n [1] [a]).

Nationally, the legislative response to early discharge policies instituted by insurers and health maintenance organizations has been widespread. An article in the Dow Jones publication *Barrons* reported that over "30 state legislatures have passed patient-rights bills that, among other things, mandate various standards of care and covered services for health insurers operating in each state." Among particular requirements, "minimum hospital stays are being established, such as two days in the maternity ward for new mothers. The one-day, drive-by delivery instituted by many managed-care companies will soon be history" (Jonathan R. Laing, *Can Managed Care Be Saved?*, Barrons, May 15, 2000, Investing in Health supp, at H4).

Apart from expressing the Legislature's assessment that

such early discharge policies are abusive, the subsequent enactment of a remedial statute does little to advance plaintiff's position in this matter. What sets her case apart from similar actions is the absence of any readily identifiable act of medical malpractice that might afford the basis for a remedy under State law. Culpability rests on the failure of U.S. Healthcare to provide for a postpartum examination of the newborn infant by a physician, as stated in literature jointly disseminated by the pertinent professional societies. Whether or not these "guidelines" can be said to represent the societies' position on what constitutes sound and acceptable medical practice remains to be determined. For purposes of this appeal, it is clear that the HMO's postpartum treatment protocol did not include examination by a physician. Instead, U.S. Healthcare contracted with a nursing agency to conduct a home visit for the purpose of examining the child. It is uncontested that the nurse found the infant to be normal and that, within hours, he was seen at an emergency room, where he was diagnosed with a critical heart defect that ultimately resulted in his death. Significantly, it is not suggested that defendant HMO extended the option to have the follow-up examination of the newborn performed by a physician.

It is apparent from the remarks of the United States Supreme Court in *Pegram* (*supra*) that it regards the physician's exposure to medical malpractice claims as a restraint on the financial incentive to limit patient care inherent in the HMO scheme. The matter on appeal is highly unusual in that the wrong alleged—subjecting plaintiff's decedent to treatment at the hands of "incompetent and/or unskilled medical professionals"—is one of ordinary negligence; defendant HMO contracted with a provider that was unqualified to render the necessary medical services. The potential for malpractice liability that might operate to prevent a physician from unreasonably limiting patient care has no deterrent effect on the HMO. The only restraint on the substitution of the services of a less qualified or even unqualified practitioner for those of a physician is State law governing the delivery of medical services.

Nothing in the ERISA preemption provision suggests that it was designed to abrogate supervision of the practice of medicine by the several States (*Nealy v U.S. Healthcare, supra*, at 217-218). To the contrary, "Quality control of plan benefits received by participants * * * 'is a field traditionally occupied by state regulation' " (*Tufino, supra*, at 249, quoting *Dukes v U.S. Healthcare*, 57 F3d 350, 357, *cert denied* 516 US 1009). As

the Supreme Court has made clear, its decision in *New York State Conference of Blue Cross & Blue Shield Plans v Travelers Ins. Co.* (514 US 645, 654-655) held that "health care [is] a subject of traditional state regulation" (*Pegram v Herdrich*, 530 US 211, 237), indicating that ERISA does not preempt State medical malpractice claims absent "clear manifestation of congressional purpose" (*id.*).

Employing a nursing service to perform a function requiring diagnostic skills borders on abetting the unauthorized practice of medicine (Education Law § 6512 [2]; §§ 6521, 6522). It endangers the welfare of the patient by fostering the false impression that the assurances of good health proceed from an authoritative source, thereby leading to a delay in treatment and aggravation of the patient's condition. As this Court noted in *McKinney v Bellevue Hosp.* (183 AD2d 563, 565), the basis of the wrong is ordinary negligence, not medical malpractice: " 'The causal connection between the wrongful conduct and the resulting damage, essential throughout the law of torts, takes in cases of misrepresentation the form of inducement of the plaintiff to act, or to refrain from acting, to his detriment' " (quoting Prosser, Torts § 108, at 714 [4th ed]; *see also, Yaniv v Taub*, 256 AD2d 273, 274).

Defendant HMO has not established its lack of wrongdoing. Nor has it eliminated every question of fact necessary to entitle it to judgment as a matter of law. Questions remain as to the qualifications of the nurse practitioner who examined plaintiff's decedent. The practice agreement or protocols required to authorize a qualified "nurse practitioner" to render a diagnosis is not contained in the record (Education Law § 6902 [3] [a]). In addition, the collaborating licensed physician (*id.*) is not specified and, therefore, it is not clear whether the nurse, even if qualified under the Education Law to make a diagnosis, is the agent of an unidentified physician or the HMO for the purposes of apportioning liability for any malpractice committed in connection with her examination of plaintiff's decedent.

## Summary Judgment

The majority avoids any consideration of governing State law, taking the position that the HMO's violation of measures governing the practice of medicine is not a basis of liability specifically asserted by plaintiff. This view is contrary to the liberal construction afforded to pleadings upon a motion seeking their dismissal and abrogates the Court's express obligation to take judicial notice of State statutes without request (CPLR 4511 [a]). Furthermore, the cases cited by the majority in support of this position are inapposite.

"Modern pleading rules are 'designed to focus attention on whether the pleader has a cause of action rather than on whether he has properly stated one'" (*Rovello v Orofino Realty Co.*, 40 NY2d 633, 636, quoting 6 Carmody-Wait 2d, NY Prac § 38:19). Whether evidentiary material is considered or not, "the sole criterion is whether the pleading states a cause of action, and if from its four corners factual allegations are discerned which taken together manifest any cause of action cognizable at law a motion for dismissal will fail" (*Guggenheimer v Ginzburg*, 43 NY2d 268, 275). To this end, "affidavits may be used freely to preserve inartfully pleaded, but potentially meritorious, claims" (*Rovello v Orofino Realty Co., supra,* at 635), and deficiencies in the complaint may be remedied by evidence of record (*O'Grady v New York City Hous. Auth.,* 259 AD2d 442). Whether an appeal involves an order deciding a motion for summary judgment or a pre-answer motion to dismiss, the reviewing court "must view the facts in a light most favorable to the plaintiff" (*Crosland v New York City Tr. Auth.,* 68 NY2d 165, 168, n 2). The "allegations must be read in the light most favorable to the plaintiff consistent with the rule that in opposing motions to dismiss for failure to state a cause of action and motions for summary judgment the plaintiff's submissions must be accepted as true" (*Ingle v Glamore Motor Sales, supra,* 73 NY2d, at 194).

Defendant HMO's notice of motion fails to specify the ground upon which summary disposition is sought, apart from reciting that it seeks "an order, pursuant to CPLR 3212, granting summary judgment dismissing the complaint." Neither the motion nor defendant's reply are accompanied by the affirmation of an attorney. Rather, each relies on the affirmation of the physician employed as U.S. Healthcare's Medical Director. The only stated predicate for relief is the averment in the notice of motion that, "as a matter of law, there is no factual or legal basis for liability of U.S. Healthcare to plaintiffs." Defendant has attached numerous documents to the moving papers in support of its motion. Furthermore, no discovery has been obtained from movant, and the fair import of the HMO's brief is that none was necessary.

In light of the complaint's explicit allegation that plaintiff's decedent received medical treatment from unqualified practitioners, defendant HMO cannot profess surprise by inquiry into its submissions purporting to justify the treatment regimen adopted in its "L'il Appleseed" perinatal care program. Moreover, plaintiff's brief specifically asserts that "the relationship between U.S. Healthcare and New York Home I.V. is a

question of fact to be determined by the jury" and, indeed, the capacity of the pediatric nurse employed in defendant's "L'il Appleseed" program presents questions of supervision and control not resolved by the record.

In any event, the question before this Court is whether defendant HMO has established, as a matter of law, that the complaint is insufficient to state any cause of action against it. The cases cited by the majority, which are critical of entertaining novel theories on appeal, are inapposite in this context. *Lefkowitz v Lebensfeld* (51 NY2d 442) concerns the capacity of the Attorney General to maintain suit. It holds (at 448) that, having invoked one statutory basis for standing in opposition to a motion to dismiss, "[t]he Attorney-General may not, on appeal, advance a different theory and rely on additional statutory authority, especially here where the record could have been further developed had the contentions been raised at Special Term." Quite apart from the Court's consideration of the standing issue, not germane to this case, the stated proscription finds application where a disputed factual issue might have been obviated by an evidentiary showing before the nisi prius court (*First Intl. Bank v Blankstein & Son*, 59 NY2d 436, 447). In the matter under review, there is no factual dispute, and the sufficiency of the complaint represents a pure question of law. Thus, even if it could be said that an argument is presented for the first time on appeal, "it raises a pure question of law that is apparent from the face of the record and could not have been avoided by the opposing party had it been timely raised (*Chateau D'If Corp. v City of New York*, 219 AD2d 205, 209, *lv denied* 88 NY2d 811; *see also, Matter of Richardson v Fiedler Roofing*, 67 NY2d 246, 250)" (*Caldwell v 302 Convent Ave. Hous. Dev. Fund Corp.*, 272 AD2d 112, 114). Unlike *Lindgren v New York City Hous. Auth.* (269 AD2d 299), also cited by the majority, the disposition of this appeal does not "require this Court to decide disputed factual issues" (*supra*, at 303), only to identify them and consign them to the trier of fact. Finally, *Lichtman v Grossbard* (73 NY2d 792, 794) is not a summary judgment case and merely expresses the Court of Appeals' view of its own review powers in respect of a decision after trial: "It is well settled that when a case has been pleaded and tried on one theory, this court cannot grant recovery on another theory." It is clear that this standard is inappropriate in the context of summary judgment, which only rises to " 'the procedural equivalent of a trial' " when it is granted (*Capelin Assocs. v Globe Mfg. Corp.*, 34 NY2d 338, 341, quoting *Falk v Goodman*, 7 NY2d 87, 91).

The sufficiency of the complaint is inherently intertwined

with the construction of statutes that circumscribe the liability of a health maintenance organization, on the one hand, and with those that regulate the practice of medicine, on the other. Therefore, more on point is *Matter of Richardson v Fiedler* (67 NY2d, *supra*, at 250), which holds that a question of statutory interpretation can be entertained even though it is raised for the first time before the Court of Appeals (*see also, Travelers Indem. Co. v Levy*, 195 AD2d 35, 41-42).

Defendant HMO has produced documentary evidence that the physicians who provided medical care to plaintiff's decedent were independent contractors and not its employees. While materially refuting the HMO's liability for acts of medical malpractice, the independent status of its physicians and other health care providers does not refute the allegation that the infant was subjected to "improper medical and hospital care and treatment" rendered by "incompetent and/or unskilled medical professionals." Nor does it absolve defendant from culpability for an act of ordinary negligence in contracting with unqualified practitioners to provide medical services they are unauthorized to render. The HMO's contentions in support of its motion must be assessed by reference to applicable State law (CPLR 4511 [a]). By its reliance on the Guidelines for Perinatal Care (*supra*) to support its early discharge program, defendant placed the propriety of its services in issue. Having affirmatively raised the subject, U.S. Healthcare cannot complain that it has been unfairly prevented from addressing the appropriateness of its perinatal care program, whether in respect of the recommendations contained in the document relied upon or under controlling law.

## Summary

As *Pegram v Herdrich* (530 US 211, *supra*) makes clear, the decision to furnish or withhold medical services is consigned to the unfettered discretion of the HMO. However, having undertaken to provide medical services, the HMO is obliged to comply with State law regarding the qualifications of the medical practitioners engaged to render them. It should be emphasized that this is a narrow basis of liability, dependent upon the peculiar facts of this case: the record is unclear with regard to either the qualifications required or the actual qualifications possessed by the nurse practitioner.

The conclusion that summary judgment is inappropriate does not represent a "wholesale attack[ ]" on the institution that was decried in *Pegram* (*supra*, at 234) "solely because of [its HMO] structure, untethered to claims of concrete harm." There

is sufficient evidence of record to suggest that the HMO engaged the services of a nursing service to conduct an examination requiring diagnostic skills; that the nurse practitioner was not qualified to render the requisite diagnosis; that plaintiff relied upon the assurances of the nurse practitioner as to the health of her infant son; and that the concomitant delay in seeking qualified medical assistance resulted in injury or aggravation of injury to plaintiff's decedent. Furthermore, assuming the nurse practitioner was qualified to render a diagnosis, the issue of agency remains unresolved, notwithstanding the disclaimers in the literature distributed to HMO participants, absent the prescribed practice agreement or protocols or any evidence of the identity of the nurse's supervising physician and the relationship of that physician to the HMO. As the limited submissions on behalf of defendants present unresolved factual issues, summary judgment should be denied.

Accordingly, the order of the Supreme Court, Bronx County (Alan Saks, J.), entered January 19, 1999, which, insofar as appealed from, granted the motion of defendant U.S. Healthcare for summary judgment dismissing the complaint as against it, should be reversed, on the law, the motion denied and the complaint reinstated.